**TEXAS OUTFITTERS LIMITED, LLC, Appellant**

v.

**Carolyn Grace NICHOLSON, William Luther Carter, Jr., and Dora Jo Carter, Individually and as General Partner of Carter Ranch, Ltd., Appellees**

No. 04-16-00392-CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: May 17, 2017

Melodee Laine Gruber, San Antonio, Danica L. Milios, Sean Jordan, Austin, for Appellant.

Tom Joseph, Anne M. Joseph, San Antonio, for Appellees.

Sitting: Rebeca C. Martinez, Justice, Patricia O. Alvarez, Justice, Luz Elena D. Chapa, Justice

## OPINION

Opinion by: Luz Elena D. Chapa, Justice

Texas Outfitters appeals a money judgment the trial court rendered in favor of appellees, the Carters. Texas Outfitters, which held the executive rights regarding the Carters' mineral interest, argues it did not breach its fiduciary duty of utmost good faith and fair dealing by refusing to lease the Carters' mineral interest. We conclude the trial court, as the factfinder, made reasonable credibility determinations based on conflicting evidence and did not err in awarding damages to the Carters based on its findings. We therefore affirm the trial court's judgment.

### BACKGROUND

Before 2002, the Carters owned a 1,082-acre tract known as Derby Ranch in Frio County. The Carters owned 50% of the mineral interest, and their relatives, the Hindeses, owned the other 50%. In 2002, Texas Outfitters, through its sole owner Frank Fackovec, offered to buy the surface estate for the purpose of operating a hunting business. Texas Outfitters also sought the executive rights to the Carters' 50% mineral interest. Dora Jo Carter, who owned the surface individually, sought and obtained the executive rights from her children, Carolyn and William. Dora Jo then sold the surface, the executive rights, and a 4.16% royalty interest to Texas Outfitters for $1 million. Dora Jo partially owner-financed the sale.

Texas Outfitters received two offers to lease its and the Carters' mineral interest in 2010. In March 2010, it received and rejected an offer to execute a lease with a 22% landowner's royalty and a $450 per-acre bonus. In June 2010, El Paso Exploration & Production Company offered a mineral lease with a primary term of three years with a 25% landowner royalty and a $1,750 per-acre bonus. El Paso extended the same lease offer to the Hindeses, who within sixty days of receiving the offer

executed a lease with El Paso covering their 50% mineral interest.

According to Dora Jo and Carolyn, Fackovec visited Dora Jo at her home to discuss leasing the Carters' mineral interest. Dora Jo and Fackovec did not discuss any lease offer specifically, but Fackovec told Dora Jo "there would be no lease" because he wanted to protect his hunting business, which he had developed into a deer breeding operation. Dora Jo "took it from him that he was not planning to lease."

The Carters, through their attorney, arranged a meeting in August 2010 with Texas Outfitters. The meeting was held at a mediation center in San Antonio, but a mediator did not participate in the meeting. The Carters, their attorney, Fackovec, and his attorney Richard Butler attended the meeting. Although the meeting was not a mediation, Fackovec sat in another room by himself most of the day while Butler met with the Carters and their attorney. According to the Carters, the parties had reached an agreement that Dora Jo would forgive $263,000 on the note for Derby Ranch in exchange for Texas Outfitters executing a lease with El Paso. According to Texas Outfitters, the Carters wanted to buy back their executive rights in exchange for forgiving part of the note, and Texas Outfitters asked the Carters to consider agreeing to include surface protections in the executive-rights deed. The parties agreed to finalize an agreement by October 15, 2010.

After the meeting, the parties corresponded through emails and letters. On September 11, 2010, Butler emailed the Carters' attorney, stating:

Take a look at this draft settlement agreement and the surface protection clauses that will be incorporated into the executive rights conveyance document and the leases our clients will be signing.

These surface protection clauses are taken from the leases that have been signed with El Paso by some of the neighboring ranchers, with some additions. Also attached is a[n] amortization schedule for the amended note to be signed by the parties. Please review these with your clients and let me know if you have aqny [sic] problems or questions.

On October 28, 2010, Butler sent another email to the Carters' attorney, stating:

We have failed to reach agreement on several points of our attempted resolution of the mineral interest issues by the October 15th deadline the parties had agreed to. I have visited with [Fackovec] and we have determined that the resolution we had attempted was, by its very nature too complicated and likely to lead to further conflicts, so we are going to employ a completely different approach. The settlement we propose is as follows:

1. Texas Outfitters will be conveyed 25% of the minerals in fee simple under the Ranch (which will replace, not be in addition to his presently held mineral interest);

2. Texas Outfitters will hold no executive rights to the Carter mineral interests, freeing the Carters to lease their interests at any time, as the Hindes[es] did. [Fackovec] will, likewise, be able to negotiate leases of his mineral interests as he wishes;

3. The Texas Outfitters-Carter promissory note will remain as is-no reduction;

4. If and when Texas Outfitters leases its mineral interests (which it will have strong financial incentive to do), it will make a loan payment of $275,000 of accrued interest and principal upon closing of the lease. This payment would be in addition to, not

in lieu of the regular scheduled loan payments.

On March 22, 2011, the Carters' attorney sent a letter to Texas Outfitters. The March 22, 2011 letter states:

You ... know that my clients have requested that you execute the Oil and Gas Lease, which has been presented to you for development of the oil and gas minerals beneath the surface of such acreage.

Additionally, you also know that they have made many concerted efforts towards persuading you to sign such Lease regarding their interests in such minerals, in accordance with your fiduciary responsibility to them. However, you have persisted in refusing to sign the Oil and Gas Lease, which would permit the development of their mineral interests beneath the land sold to you.

The Carters' attorney sent another letter on April 27, 2011, noting Texas Outfitters' continued refusal to lease and that "[t]his matter has been talked out."

And on May 11, 2011, Butler sent the Carters' attorney another settlement offer on behalf of Texas Outfitters, stating:

[Texas Outfitters] will sell the ranch it purchased from the Carters, including all of [Texas Outfitters'] mineral interests, for the sales price of $4,200,000. In the alternative, if the Carter Family will convey to [Texas Outfitters] 25% of the minerals in and under the [Derby] Ranch, [Texas Outfitters] will convey to the Carter Family all of the executive rights [Texas Outfitters] owns in the mineral interests the Carter Family retains.

The parties did not reach a settlement agreement. The Carters sued Texas Outfitters, alleging it breached its duty of utmost good faith and fair dealing by refusing to lease. After the Carters filed suit, Texas Outfitters received two lease offers from other companies, but no lease was executed. One of these lease offers included a $2,000 per-acre bonus, but the offer was withdrawn when the company learned of the Hindeses' lease with El Paso. Texas Outfitters thereafter sold the surface and its executive rights to a third party for $4.5 million.

The case proceeded to a bench trial, at which Carolyn, Dora Jo, Fackovec, Butler, and Pamela Hindes testified. The trial court also admitted the parties' correspondence without objection, the Hindeses' mineral lease with El Paso, and the mineral deed by which Dora Jo conveyed the executive rights and a royalty interest to Texas Outfitters. Following a bench trial, the trial court awarded $867,654.32 in damages to the Carters. The trial court also made findings of fact and conclusions of law, finding Texas Outfitters breached its duty to the Carters by refusing to lease their mineral interest. In addition to finding Texas Outfitters breached its duty, the trial court made several specific fact-findings regarding the factual background of the case. Texas Outfitters appeals, arguing it did not breach its executive duty to the Carters.

## THE EXECUTIVE DUTY

"The right to lease minerals—the executive right—is one 'stick' in the bundle of ... real property rights that comprise a mineral estate." *Lesley v. Veterans Land Bd. of Tex.*, 352 S.W.3d 479, 480-81 (Tex. 2011). "The executive right is the right to make decisions affecting the exploration and development of the mineral estate" and includes the right to decide whether to execute a mineral lease. *Id.* at 487. However, "[t]he law has never left non-executive interest owners wholly at the mercy of the executive." *Id.* "[W]hile an executive may be understood to have considerable latitude, the executive lacks unbridled discre-

tion. Our jurisprudence in this area of the law emerged in recognition of the potential for abuse inherent in this division of rights." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 81-82 (Tex. 2015). "Thus, while an executive has a largely unfettered hand in negotiating and structuring a mineral lease, that discretion is circumscribed by the duty owed to a non-executive." *Id.* at 82.

The supreme court "held long ago that the executive owes other owners of the mineral interest a duty of 'utmost fair dealing.'" *Lesley*, 352 S.W.3d at 481. Although the supreme court "ha[s] characterized an executive[] duty of utmost fair dealing as fiduciary in nature," *id.* at 488, the supreme court recently clarified the executive's fiduciary duty does not incorporate the traditional fiduciary obligation to place the interest of the other party before its own. *KCM Fin.*, 457 S.W.3d at 81. "This limitation distinguishes the executive duty from a more paradigmatic fiduciary relationship, like principal and agent." *Id.* The executive's fiduciary duty of utmost good faith and fair dealing does not require the executive "to wholly subordinate its interests in favor of the non-executive if their interests conflict" or "to grant priority to the non-executive's interest," and "the executive may discharge its duty to the non-executive without yielding entirely to the non-executive's best interests." *Id.* at 74, 81, 82.

The supreme court has held an executive can breach its duty either when executing a lease or when refusing to execute a lease. *Id.* at 74-75 (executing a lease); *Lesley*, 352 S.W.3d at 480 (refusing to execute a lease). In *KCM Financial*, the supreme court articulated that, when executing a lease, the executive breaches its duty by "engag[ing] in acts of self-dealing that unfairly diminish[] the value of the non-executive interest." 457 S.W.3d at 82.

The executive engages in self-dealing by exacting a benefit for itself that it does not also acquire for the non-executive. *Id.* at 80-82 (citing *Manges v. Guerra*, 673 S.W.2d 180, 182-84 (Tex. 1984)). In *KCM Financial*, the executive signed a lease with a sub-market royalty rate and an above-market bonus payable only to the executive. *Id.* at 74. The supreme court held this was evidence of self-dealing that unfairly diminished the value of the non-executive's mineral interest. *Id.* at 83-84.

When refusing to execute a mineral lease, the executive generally maintains the status quo and does not exact or acquire any additional benefits for itself. *Lesley*, 352 S.W.3d at 491 (acknowledging the executive's mineral interest "was treated the same as [the non-executives']" when the executive refused to lease); *In re Bass*, 113 S.W.3d 735, 745 (Tex. 2003) (orig. proceeding) (explaining that the executive, by not leasing, "has not acquired any benefits for himself"). Although an executive who refuses to lease generally might not have exacted a benefit for itself that it did not acquire for the non-executive, the executive can nevertheless breach its duty of utmost good faith and fair dealing by refusing to lease. *See Lesley*, 352 S.W.3d at 491. In *Lesley*, the supreme court articulated the applicable standard in the refusal-to-lease context: an executive can breach its duty by refusing to lease "[i]f the refusal is arbitrary or motivated by self-interest to the non-executive's detriment." *Id.*

The supreme court has recently addressed the executive duty in the refusal-to-lease context in two cases: *In re Bass* and *Lesley v. Veterans Land Board of the State of Texas*. In *Bass*, the supreme court held the executive did not breach its duty because the executive had not yet executed a lease and thus had not yet exercised its executive rights. 113 S.W.3d at 745. In *Lesley*, the supreme court held an execu-

tive breached its duty by filing restrictive covenants that effectively limited development of the mineral estate for the purpose of protecting residential lot owners on the surface. 352 S.W.3d at 479, 491. The supreme court distinguished *Bass*, stating "*Bass* can[not] be read to shield the executive from liability for all inaction." *Id.* at 491. "It may be that an executive cannot be liable to the non-executive for failing to lease minerals when never requested to do so, but an executive's refusal to lease must be examined more carefully." *Id.* The supreme court rejected the executive's argument that "the restrictive covenants benefited only its interest in the surface estate, and its mineral interest was treated the same as the [non-executives']." *Id.* Thus, when an executive refuses to accept offers to lease, we must examine the executive's refusal carefully to determine whether "the refusal is arbitrary or motivated by self-interest to the non-executive's detriment." *Id.*

## A. Texas Outfitters' Issues & Arguments on Appeal

In its brief, Texas Outfitters presents the following four issues:

1. Was [Texas Outfitters'] decision to defer leasing in an attempt to obtain a higher bonus (1) an act of self-dealing that (2) unfairly diminished the value of the non-executive interest?

2. Is the evidence factually and legally insufficient to support Finding of Fact 18 to the extent it suggests that TOL refused the El Paso lease solely to gain an additional $250.00 per acre?

3. To the extent this Court construes Finding of Fact 23 as a finding that [Texas Outfitters] refused to lease to protect its deer business, was the evidence factually and legally insufficient to support the finding?

4. Is the evidence factually and legally insufficient to support Conclusions of Law 9 and 10 that [Texas Outfitters] gained for itself the ability to sell the Derby Ranch at a large profit because the land was not encumbered by a lease?

Texas Outfitters argues the executive's discretion in executing a lease is "subject only to the rule that it not engage in self-dealing that unfairly diminishes the value of the non-executive's interest" and it did not violate this rule by refusing to execute a lease with El Paso. Texas Outfitters contends the trial court's specific fact-findings regarding the factual background of the case do not support the trial court's ultimate finding that Texas Outfitters breached its duty and there is legally and factually insufficient evidence to support the trial court's specific fact-findings regarding the factual background. Texas Outfitters includes its legal and factual sufficiency challenges to the trial court's specific fact-findings within its overall argument that it did not breach its duty to the Carters.

## B. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's verdict. *Milt Ferguson Motor Co. v. Zeretzke*, 827 S.W.2d 349, 352 (Tex. App.—San Antonio 1991, no writ). When the trial court makes findings of fact and conclusions of law, we may review the findings of fact for legal and factual sufficiency. *Dodeka, L.L.C. v. Campos*, 377 S.W.3d 726, 729 (Tex. App.—San Antonio 2012, no pet.). "We review de novo the trial court's legal conclusions based on the findings of fact to determine their correctness." *Id.* "Findings which deal with the ultimate and determinative fact questions of the case are not to be disregarded simply because they appear in the 'conclusions of law.'" *See Posner v. Dall. Cty. Child Welfare Unit of*

*Tex. Dep't of Human Servs.*, 784 S.W.2d 585, 587 (Tex. App.—Eastland 1990, writ denied).

◼◼◼◼ "When reviewing a question of legal sufficiency, we consider all of the evidence in the light most favorable to the finding, disregarding all evidence and inferences to the contrary" if a reasonable factfinder could. *In re C.Z.B.*, 151 S.W.3d 627, 630 (Tex. App.—San Antonio 2004, no pet.); *accord City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005). We will overrule a legal sufficiency challenge if there is more than a scintilla of evidence to support the finding. *Dodeka*, 377 S.W.3d at 729. "As the factfinder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Villarreal v. Guerra*, 446 S.W.3d 404, 411 (Tex. App.—San Antonio 2014, pet. denied). "In reviewing a question of factual sufficiency, we consider and weigh all of the evidence presented at trial in a neutral light, setting aside the verdict only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust." *C.Z.B.*, 151 S.W.3d at 630. In conducting our factual sufficiency review, we may not substitute our judgment for that of the factfinder. *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006).

## C. The Applicable Standard for the Executive Duty in the Refusal-to-Lease Context

In support of its first issue, Texas Outfitters argues an executive's only duty is not to engage in acts of self-dealing that unfairly diminish the value of the non-executive interest. It further argues it did not breach its duty because it did not engage in acts of self-dealing that unfairly diminished the value of the Carters' mineral interests. Although the supreme court held in *KCM Financial* that an executive breaches its duty by "engag[ing] in acts of

self-dealing that unfairly diminish[ ] the value of the non-executive interest," *KCM Financial* concerned self-dealing in context of the execution of a lease, not the refusal to execute a lease. 457 S.W.3d at 80-82. Relying on *KCM Financial* almost exclusively, Texas Outfitters' arguments are premised upon the duty an executive owes to the non-executive when executing a lease.

◼◼◼◼ Here, however, it is undisputed that Texas Outfitters did not execute a lease, and the trial court found Texas Outfitters breached its duty because it refused to execute a lease. In its Conclusions of Law, the trial court stated, "If the [executive's] refusal [to lease] is motivated by self-interest to the non-executive's detriment, the executive may have breached his duty." The trial court correctly stated the applicable duty in the refusal-to-lease context: "the refusal [must not be] arbitrary or motivated by self-interest to the non-executive's detriment." *See Lesley*, 352 S.W.3d at 480.

## D. Sufficiency of the Findings & Evidence

In its remaining issues, Texas Outfitters challenges some of the trial court's specific fact-findings about the factual background of the case, but does not expressly challenge the trial court's ultimate finding stating Texas Outfitters breached its executive duty. The trial court's finding that Texas Outfitters breached its executive duty is contained in the trial court's Conclusions of Law. "Findings which deal with the ultimate and determinative fact questions of the case are not to be disregarded simply because they appear in the 'conclusions of law.'" *Posner*, 784 S.W.2d at 587.

◼◼◼◼ However, "[a]ppellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is

not lost by waiver." *Perry v. Cohen,* 272 S.W.3d 585, 587 (Tex. 2008) (per curiam). We will "reach the merits of an appeal whenever reasonably possible." *Id.* Texas Outfitters argues it "did not breach its executive duty by refusing to enter the El Paso lease." It also raises legal and factual sufficiency challenges to the trial court's specific fact-findings relevant to whether it breached its executive duty. We liberally construe Texas Outfitters' brief as challenging the sufficiency of the evidence to support the trial court's finding that Texas Outfitters breached its executive duty to the Carters. *See id.*

Texas Outfitters appears to challenge the sufficiency of the trial court's findings and the sufficiency of the evidence. To the extent Texas Outfitters intended to raise any other issue, we hold the issue is waived. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.,* 345 S.W.3d 537, 562 (Tex. App.—San Antonio 2011, no pet.) (holding appellant waived issues by failing to make a clear and concise argument with appropriate citations) (citing Tex. R. App. P. 38.1(i)).

We first address whether the trial court's findings are sufficient to support the judgment. We then address whether there is legally and factually insufficient evidence that Texas Outfitters' refusal to lease was arbitrary or motivated by self-interest to the Carters' detriment. *See Lesley,* 352 S.W.3d at 491.

*1. Sufficiency of the Trial Court's Findings*

 Texas Outfitters argues the trial court's specific fact-findings (1) contradict its ultimate finding that Texas Outfitters breached its duty to the Carters; and (2) are insufficient to support the trial court's ultimate finding that it breached its executive duty. The trial court's findings of fact and conclusions of law "taken together [must be] enough to support the judg-

ment." *McAshan v. Cavitt,* 149 Tex. 147, 154, 229 S.W.2d 1016, 1020 (1950). The purpose of findings of fact is to discover the grounds the trial court found supported the judgment and to avoid presumed findings "on all grounds raised by the pleading and proof." 4 Roy W. Mc-Donald & Elaine A. Grafton Carlson, Texas Civil Practice, at 11 (2d ed. 2001); *cf. Jerry v. Ky. Cent. Ins. Co.,* 836 S.W.2d 812, 816 (Tex. App.—Houston [1st Dist.] 1992, writ denied) ("Findings of facts are not proper if they do not relate to ultimate or controlling issues."). "[F]indings of fact and the conclusions of law will be construed together; and if the findings of fact are susceptible of different constructions, they will be construed, if possible, to be in harmony with the judgment and to support it." *Gulf Liquid Fertilizer Co. v. Titus,* 163 Tex. 260, 270, 354 S.W.2d 378, 385 (1962). We will not draw inferences from the wording of findings of fact if those inferences do not support the judgment. *See id.* at 384-85 (disapproving of court of appeals' inferring additional facts from the wording of a fact-finding when the inferred facts did not support the judgment).

 Texas Outfitters argues the wording of several fact-findings "acknowledge" Texas Outfitters was willing to execute a lease and Texas Outfitters refused to lease to obtain a higher bonus amount for itself and for the Carters. In Findings of Fact 16, 18, 19, and 23 (those arguably relevant to Texas Outfitters' motive in refusing to lease), the trial court found:

16. [Texas Outfitters], as expressed through its sole owner [Fackovec], had no objection to the 25% royalty interest. His *stated* reason for refusing the lease was because he wanted to see how the play matured and try to get more money.

. . . .

18. At $250.00 additional dollars per acre, [Texas Outfitters] would have received only $11,252.80 in additional bonus money by waiting for a better offer. Meanwhile by [Texas Outfitters'] refusal to lease to El Paso the Carter Family lost $867,654.18.

19. [Texas Outfitters'] willingness to gamble its 4.16% also resulted in a gamble for the Carter Family of their 45.84%.

. . . .

23. Dora Jo Carter testified that [Fackovec] told her that he planned not to lease because of his business of a hunting lease for bringing in hunters.

(emphasis added). In Conclusions of Law 6, 7, 9, and 10, the trial court found:

6. The executive *claimed* his reason for refusal to lease was to get more bonus money. More bonus money would have benefitted the non-executive as well so could not be said to be self-dealing in and of itself.

7. However, in this case the executive chose to gamble with not only his 4.16% mineral [sic] but with the non-executive owners 45.84% when he knew that they did not want to gamble.

. . . .

9. By refusing to lease, the executive gained for itself unfettered use of the surface for its hunting operation, which was always the plan for the property from the time of its purchase.

10. By refusing to lease, the executive gained for itself the ability to sell its land at a large profit free of any oil and gas lease.

(emphasis added).

The trial court did not make any clear, express findings about Texas Outfitters' motives for refusing to execute a lease with El Paso. Instead, as stated in Conclusion of Law 6, obtaining more bonus money was Texas Outfitters' "claimed" reason for refusing to lease. Similarly, in Finding of Fact 16, the trial court found Texas Outfitters' explanation of "want[ing] to see how the play matured and try to get more money" was its "stated" reason for refusing to lease. Furthermore, the trial court noted Dora Jo's contradictory testimony stating Fackovec told her that he planned not to lease because of his business. Texas Outfitters suggests the wording of the trial court's findings of fact and conclusions of law imply the trial court found Texas Outfitters' refusal to lease was not arbitrary or motivated by self-interest. However, we may not draw inferences from fact-findings that do not support the judgment or that contradict other findings. *See id.*[1] We therefore hold the trial court's specific fact-findings do not contradict its ultimate finding that Texas Outfitters breached its duty.

Texas Outfitters' arguments also suggest that, when reviewing the trial court's ultimate finding that Texas Outfitters breached its duty, our review is limited solely to the factual background as detailed by the trial court's findings of fact and conclusions of law. Specifically, Texas Outfitters' notes:

---

1. We note Texas Outfitters' suggestion of what the trial court impliedly "acknowledged" in its findings of fact and conclusions of law is also inconsistent with what the trial court stated after closing arguments. The trial court stated, "I think it's disingenuous to think that Mr. Fackovec's real motive was to get additional bonus money. It appears to the Court that Mr. Fackovec's real motive was that he did not want his surface to be burdened by an oil and gas lease." This view appears to be reflected by Conclusions of Law 9 and 10, and there is evidence supporting these findings.

The trial court appears to have focused on three factors to erroneously determine that [Texas Outfitters] breached its duty to the Carters: (1) the Carters' interest in the mineral estate was greater than that held by [Texas Outfitters]; (2) the mineral co-tenants on the property had already entered the lease that the Carters demanded; and (3) [Texas Outfitters] eventually sold the property for $2.5 million over the purchase price.

Texas Outfitters argues these specific fact-findings do not support the trial court's ultimate finding that Texas Outfitters breached its duty to the Carters. At oral argument, Texas Outfitters further emphasized the trial court did not include other evidentiary matters in its findings of fact and conclusions of law. Texas Outfitters suggests the trial court's specific fact-findings regarding the factual background of the case must, without reference to the evidence, support the trial court's ultimate finding that it breached its duty. We disagree.

If the trial court makes findings on ultimate issues, such as the elements of the plaintiffs' claim, the trial court's failure to make findings on additional evidentiary issues is not error. *See Levine v. Maverick Cty. Water Control & Imp. Dist. No. 1*, 884 S.W.2d 790, 796 (Tex. App.—San Antonio 1994, writ denied). In its "Conclusions of Law," the trial court found several elements of the Carters' breach of executive duty claim: (1) Texas Outfitters owed the Carters a duty because it held the executive right to lease the Carters' mineral interest in Derby Ranch; (2) Texas Outfitters breached its duty by refusing to execute a lease with El Paso; and (3) the breach of that duty caused damages to the Carters in the amount they would have received had Texas Outfitters executed the

lease with El Paso. We may not disregard the trial court's ultimate findings as to these elements simply because the trial court designated them as "conclusions of law." *See Posner*, 784 S.W.2d at 587. In its "Findings of Fact," the trial court found that if Texas Outfitters had executed the lease with El Paso, the Carters would have received $867,654.

Taken together, the trial court's findings disclose the ground that the trial court found supported a $867,654 damages award: a breach of the executive duty. *See McAshan*, 229 S.W.2d at 1020; *see, e.g., Manges*, 673 S.W.2d at 184 (affirming damages award for a breach of executive duty). The trial court's failure to make further evidentiary findings supporting its ultimate finding that Texas Outfitters breached its duty is not error. *See Levine*, 884 S.W.2d at 796. We therefore hold the trial court's fact-findings are sufficient to support the judgment. Having concluded the trial court's findings are sufficient to support the judgment, we next consider whether the evidence is sufficient to support the trial court's finding that Texas Outfitters breached its duty.

### 2. Sufficiency of the Evidence

To determine whether sufficient evidence supports the trial court's finding that Texas Outfitters breached its duty, we must consider any evidence that Texas Outfitters (1) refused to lease and (2) its refusal to lease was arbitrary or motivated by self-interest (3) to the Carters' detriment. *See Lesley*, 352 S.W.3d at 480. Despite multiple offers, Texas Outfitters never leased the Carters' mineral interest. Texas Outfitters also does not expressly challenge the trial court's finding that the Carters lost over $800,000 because of Texas Outfitters' refusal to lease and there is evidence supporting this finding.[2] We must

---

**2.** Texas Outfitters speculates that although

there is evidence showing recent drilling in

therefore determine whether there is legally and factually sufficient evidence that Texas Outfitters' refusal to lease was arbitrary motivated by self-interest. *See id.* Texas Outfitters argues it refused to lease (1) to protect its existing use of the surface, which is a legitimate interest; and (2) to obtain a higher bonus payment for both itself and the Carters, which the trial court found was not self-dealing.

 Although protecting an existing use of the surface estate is a legitimate interest, an executive breaches its duty if it protects the surface estate by refusing to permit any mineral lease. *See id.* (acknowledging the accommodation doctrine but holding executive breached its duty by filing restrictive covenants to protect surface lot owners from intrusion and disruption from development of the mineral estate); *Hawkins v. Twin Mont., Inc.*, 810 S.W.2d 441, 446 (Tex. App.—Fort Worth 1991, no writ) (noting executives "do not have a duty to sacrifice their desire to protect the surface of the land, and they would be entitled to negotiate the best surface protection possible as long as they maintained good faith in their consideration of the royalty owners"). There is evidence Texas Outfitters refused to execute any mineral lease in order to protect its pre-existing use of the surface. The

record shows Dora Jo testified. Fackovec told her he did not intend to execute any lease because he wanted to protect his business, and Carolyn testified Dora Jo told her Fackovec said "there will be no lease." The record also shows Fackovec testified he purchased the Carters' executive rights so he could be involved in the development of the mineral estate. This evidence supports an inference that Texas Outfitters refused to execute any mineral lease with the intended purpose of protecting its use of the surface. Thus, the evidence supports a finding that Texas Outfitters breached its duty to the Carters by refusing to execute any lease, including a lease with El Paso, in order to protect its existing use of the surface. *See Lesley*, 352 S.W.3d at 480.[3]

 Texas Outfitters argues the evidence conclusively establishes it did not breach its duty because it merely sought reasonable surface protections. We disagree for two reasons. First, Texas Outfitters' three settlement offers demonstrate it not only sought to protect its existing use of the surface, but also sought to obtain a significant reduction on the amount it owed Dora Jo for Derby Ranch or a portion of the Carters' royalty interests. Alternatively, Texas Outfitters offered to

---

the area surrounding Derby Ranch was unproductive and the demand to lease has decreased, new technology might be developed in the future, which might result in a future mineral lease offers. Such speculation does not conclusively establish Texas Outfitters' refusal to lease was not to the Carters' detriment. *Cf. Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998) (disregarding speculative evidence in a legal sufficiency review). The evidence also establishes the Carters would have received a substantial bonus payment had Texas Outfitters executed a lease with El Paso and after the Carters filed suit, Texas Outfitters was unable to execute a lease. This is more than a scintilla of evidence

that Texas Outfitters' refusal to lease was to the Carters' detriment.

3. For the same reasons, a reasonable factfinder could have disregarded Fackovec's testimony that he was willing to execute a lease with El Paso covering only the Carters' interest. Although there is no evidence directly contradicting Fackovec's testimony that he met with El Paso at their Houston office and offered to lease only the Carters' interest, Dora Jo and Carolyn testified he told them there would be no lease, and Butler's October 10, 2010 email is evidence that Texas Outfitters was unwilling to execute a mineral lease without exacting some benefit from the Carters at their expense.

sell the surface and all of its mineral interest back to the Carters for $4.2 million. The evidence supports an inference that Texas Outfitters refused to lease not only to protect its existing surface use, but also to exact a benefit from the Carters at their expense. *See id.* at 487 ("The law has never left non-executive interest owners wholly at the mercy of the executive."). Second, Texas Outfitters did not merely seek surface protections with El Paso; it refused to permit any lease unless the Carters agreed either to convey a portion of their royalty interest or to accept deed restrictions (i.e. restrictive covenants) and a $263,000 reduction on the note. Carolyn testified the proposed restrictive covenants were too restrictive and would have interfered with executing future leases. Thus, Texas Outfitters, like the executive in *Lesley*, sought to protect an existing surface use with restrictions that would essentially preclude a mineral lease. Because the evidence supports a finding that Texas Outfitters' refusal to lease was arbitrary and motivated by self-interest, Texas Outfitters breached its duty under *Lesley*.[4]

Texas Outfitters suggests the evidence establishes it refused to lease in order to obtain a higher bonus payment for both itself and the Carters. Texas Outfitters relies heavily on Fackovec's testimony that he rejected the El Paso lease in order to obtain a higher bonus payment because bonus prices were rising quickly and Texas Outfitters pursued offers after El Paso's. A reasonable factfinder could have discredited Fackovec's testimony. *See City of Keller*, 168 S.W.3d at 821; *C.Z.B.*, 151 S.W.3d at 630. The record shows Dora Jo and Carolyn contradicted Fackovec's testimony; Carolyn testified Fackovec said "there

will be no lease" and Dora Jo testified that despite negotiations, Fackovec was planning not to lease to protect the existing use of the surface. Additionally, the undisputed evidence undermines Fackovec's explanation that Texas Outfitters was waiting for a higher bonus offer. Fackovec testified he refused to lease with El Paso in June 2010 because he was waiting for a better bonus offer. Fackovec testified bonus offers "had escalated so rapidly [in 2010] at 100, 200 an acre to 450 in March to then 1750 right after that in middle May-June." But it is undisputed that after this three-month period of quickly escalating prices, Texas Outfitters did not seek or receive a better bonus offer for over a year. Yet Texas Outfitters continuously refused to accept the El Paso lease. The correspondence between the parties suggests Texas Outfitters' actual motive in refusing to lease was to exact a benefit from the Carters to their detriment, including by diminishing their royalty interest, by exacting a $263,000 reduction on the note, or by selling its mineral interest to the Carters for $4.2 million. Because a reasonable factfinder could have discredited Fackovec's testimony, we must disregard his testimony in our legal sufficiency review. *See City of Keller*, 168 S.W.3d at 821; *C.Z.B.*, 151 S.W.3d at 630.

We hold the evidence establishes Texas Outfitters' refusal to lease was arbitrary or motivated by self-interest to the Carters' detriment. *See Lesley*, 352 S.W.3d at 487. "To be fair, there is also evidence supporting contrary conclusions and inferences, but none that we are permitted to consider in light of the applicable standard of review." *See KCM Fin.*, 457 S.W.3d at 85. The trial court, as the factfinder, was the

---

4. Alternatively, we hold an executive who unsuccessfully engages in acts of self-dealing to the non-executive's detriment breaches its duty under *KCM Financial* as does an executive who successfully engages in acts of self-dealing that unfairly devalues the non-executive's interest. *See* 457 S.W.3d at 85.

sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Villarreal*, 446 S.W.3d at 411. Because there is more than a scintilla of evidence supporting the trial court's finding that Texas Outfitters breached its duty by refusing to execute a lease with El Paso, we overrule Texas Outfitters' legal sufficiency challenge. *See Dodeka*, 377 S.W.3d at 729. Viewing all of the evidence in a neutral light, we cannot say the trial court's finding that Texas Outfitters breached its executive duty is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See C.Z.B.*, 151 S.W.3d at 630. We therefore overrule Texas Outfitters' factual sufficiency challenge. *See id.*

### 3. Texas Outfitters' Remaining Arguments

Texas Outfitters makes several other arguments: (1) *Lesley* is distinguishable; (2) affirming the trial court's judgment would conflict with *Hlavinka v. Hancock*, 116 S.W.3d 412 (Tex. App.—Corpus Christi 2003, pet. denied); and (3) affirming the trial court's judgment would recognize the non-executive can compel the executive to execute any lease the non-executive wants or to lease the executive's own royalty interest. We address each in turn.

Considering the two cases the supreme court has decided in the refusal-to-lease context, *Bass* (in which the court held there was no breach) and *Lesley* (in which the court held there was a breach), the facts of this case are much more akin to the facts in *Lesley*. Unlike *Bass*, in which no lease was ever offered to the executive,

Texas Outfitters received two lease offers before the Carters sued and exercised its executive rights by refusing to lease. *See Lesley*, 352 S.W.3d at 479. We must examine "an executive's refusal to lease . . . more carefully" than when an executive "fail[s] to lease minerals when never requested to do so." *Id.* In *Lesley*, the critical facts were that the filing of restrictive covenants limited future mineral leases, regardless of the lease terms, to protect lot owners who resided on the surface. *Id.* Here, the evidence shows Texas Outfitters would not have accepted any market-based mineral lease offer to protect its business or without exacting a benefit from the Carters. The evidence also shows Texas Outfitters sought to limit future leasing by seeking perpetual, overly-stringent restrictive covenants to protect its business. While there are other factual differences between this case and *Lesley*, the material facts are the same. Both here and in *Lesley*, the executive's refusal to lease was arbitrary or motivated by self-interest to the non-executive's detriment. *See id.* at 491.[5]

Citing *Hlavinka*, Texas Outfitters argues it could have been liable to the Carters for accepting a sub-market bonus rate had it executed the El Paso lease. Texas Outfitters suggests it was legally obligated to wait for a higher bonus offer. *Hlavinka* is readily distinguishable for several reasons. In *Hlavinka*, the court held the evidence established the executive did not engage in self-dealing, stating the following:

---

**5.** Texas Outfitters argues the Carters "knowingly contracted for a situation in which they would have no say over when and how (or if) their minerals would be leased." But it is equally true that when the Carters sold Derby Ranch to Texas Outfitters, "[t]he duty of utmost good faith owed by an executive ha[d] been settled since *Schlittler v. Smith*, 128 Tex.

628, 101 S.W.2d 543, 545 (1937)." *See Manges*, 673 S.W.2d at 183. Thus, it could also be said that Texas Outfitters knowingly contracted for a situation in which it would owe the Carters a fiduciary duty of utmost good faith and fair dealing if a mineral lease were offered. *See id.*

Testimony at trial established that surrounding landowners had received greater consideration for executing oil and gas leases than was being offered to the Hlavinkas. The Hlavinkas, admittedly not experienced in oil and gas lease transactions, attempted to acquire lease terms equal to or above the market value of the surrounding land owners. This was not a case where the Hlavinkas were arbitrarily refusing to lease under any circumstances. The record reflects that just prior to suit being filed against them, the Hlavinkas were willing to negotiate with Adobe and were asking for $650.00 an acre. Thus, the record shows that the Hlavinkas were willing to lease and were seeking terms similar to those obtained by neighboring land owners. 116 S.W.3d at 419, *disapproved of on other grounds by Lesley*, 352 S.W.3d at 491 & n.78. Here, there is no evidence that surrounding landowners in the county had received more than a $1,750 per-acre bonus. Instead, Pamela Hindes testified her family accepted a $1,750 per-acre bonus for the same property in June 2010; she testified El Paso's offer was the highest bonus offer she had received for any nearby properties; and Texas Outfitters did not seek or receive a higher bonus offer until after the Carters sued in June 2011. Thus, the evidence does not conclusively establish El Paso's $1,750 per-acre bonus offer was a sub-market offer at the time El Paso made its offer. There is also no evidence that "just prior to suit being filed" Texas Outfitters was willing to lease. The only evidence that Texas Outfitters sought a higher bonus offer was after the Carters sued. Furthermore, unlike *Hlavinka*, there is conflicting evidence regarding Texas Outfitters' motive for refusing to lease and whether Texas Outfitters was actually willing to lease. Finally, it is undisputed the Carters asked Texas Outfitters to accept El Paso's offer. We cannot agree with

Texas Outfitters' suggestion that the evidence establishes that had it accepted El Paso's offer, the Carters would have sued and Texas Outfitters would have been liable for accepting a sub-market bonus rate.

Texas Outfitters further argues it did not breach its duty by not executing "one, specific oil and gas lease"; the Carters had no authority to demand that Texas Outfitters enter any particular lease; and recognizing a breach of the executive duty under these facts requires the benefit of hindsight and effectively makes the executive "the insurer of all decisions in a volatile oil and gas market, rendering the executive 'right' nothing more than an expensive liability." But the evidence supports a finding that Texas Outfitters refused to execute the El Paso lease based on its arbitrary and self-motivated refusal to permit *any* lease for the purpose of protecting its use of the surface and to exact a benefit from the Carters to their detriment. As we have explained, the circumstances giving rise to the breach of duty in this case are sufficiently similar to the circumstances giving rise to the breach of duty in *Lesley*. In *Lesley*, the supreme court did not need to "decide . . . whether as a general rule an executive is liable to a non-executive for refusing to lease minerals, if indeed a general rule can be stated, given the widely differing circumstances in which the issue arises." 352 S.W.3d at 491. Similarly, we need not and do not address whether the executive's mere failure to execute any lease the non-executives desire is a breach of the executive duty. *See id.* As such, our opinion should not be understood as announcing any rule or principal beyond those the supreme court announced in *Lesley* or *KCM Financial*. We simply conclude that under *Lesley* and *KCM Financial*, sufficient evidence supports the trial court's finding that Texas

Outfitters breached its executive duty by refusing to lease.

## CONCLUSION

Legally and factually sufficient evidence supports the trial court's finding that Texas Outfitters breached its executive duty by refusing to lease the Carters' mineral interest. Moreover, the trial court's findings support the judgment. We therefore affirm the trial court's judgment.