# IN THE SUPREME COURT OF TEXAS

No. 17-0509

TEXAS OUTFITTERS LIMITED, LLC, PETITIONER,

v.

CAROLYN GRACE NICHOLSON, WILLIAM LUTHER CARTER, JR., AND
DORA JO CARTER, INDIVIDUALLY AND AS GENERAL PARTNER OF
CARTER RANCH, LTD., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

**Argued October 10, 2018**

JUSTICE LEHRMANN delivered the opinion of the Court.

JUSTICE BUSBY did not participate in the decision.

The holder of the executive right to lease a mineral estate owes non-participating mineral- and royalty-interest owners a duty of utmost good faith and fair dealing. We recently examined the scope of this duty and concluded that, while its parameters "are imprecise, at bottom, the executive is prohibited from engaging in acts of self-dealing that unfairly diminish the value of the non-executive interest." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 74 (Tex. 2015). In this case, we are asked to apply the duty in the context of an executive's refusal to lease in contravention of the non-executive's known wishes. The trial court found that the executive violated its duty, and the court of appeals affirmed. Under the facts and circumstances

of this case, we hold that legally sufficient evidence supports the trial court's finding and therefore affirm the court of appeals' judgment.

## I. Background

Dora Jo Carter owned the surface estate of a 1,082-acre tract in Frio County known as Derby Ranch. She and her two children, Carolyn Nicholson and William Carter, Jr., collectively owned an undivided 50% interest in the mineral estate. The Hindes family, relatives of the Carters, owned the other 50% mineral interest. In 2002, the Carters sold the surface estate to Texas Outfitters Limited, LLC, along with a 4.16% mineral interest and the executive rights to the 45.84% mineral interest retained by the Carters. Frank Fackovec, Texas Outfitters' sole owner, intended to use the ranch as his residence as well as to operate a hunting business. He testified at trial that he would not have purchased the property without the executive rights and the corresponding control over future mineral development. The Carters partially financed the approximately $1 million purchase price.

In March 2010, Texas Outfitters received and rejected an offer to lease its and the Carters' mineral interest. Fackovec testified that he believed the offer, which included a $450-per-acre bonus and a 22% royalty, was too low. The record does not reflect when the Carters learned about this offer, and they do not complain in these proceedings about Texas Outfitters' rejection of it.

In June 2010, the Hindeses leased their 50% mineral interest in the ranch to El Paso Oil Exploration & Production Company for a $1,750-per-acre bonus and a 25% royalty. El Paso made the same offer to Texas Outfitters for the remaining 50% interest, and the Carters wanted

Fackovec to accept it.[1]  Fackovec was aware of the Carters' position but rejected the offer.  At trial, the parties presented competing testimony regarding the reason for the rejection.  Fackovec testified he thought the bonus was too low and wanted to wait for prices to go up as the oil play matured.  Dora Jo Carter testified that, although she and Fackovec did not specifically discuss the El Paso lease, Fackovec had told her he "planned not to lease because of his business."

The Carters requested a meeting with Fackovec, which took place in August 2010 and involved both the parties and their attorneys.  The bulk of the negotiations appears to have centered on an arrangement for the Carters to buy back their executive rights.  At the conclusion of the meeting, the parties had reached an agreement in principle whereby: (1) Texas Outfitters would convey to the Carters the executive rights on their retained mineral interest; (2) the deed conveying those rights would include as-yet unspecified surface protections to be included in the El Paso lease and any future lease; (3) Texas Outfitters would execute the lease as to its own 4.16% mineral interest; (4) the Carters would forgive $263,000 of the owner-financed note on the ranch (approximately half of what was still owed); and (5) El Paso would prepay Texas Outfitters a negotiated amount for surface damages and water usage.  However, the agreement was never finalized because the parties were unable to agree on the scope of the additional surface protections, which the Carters concluded were too onerous and would unduly restrict their ability to lease the minerals in the future.  Texas Outfitters, through its attorney, made

---

[1] Fackovec testified that El Paso never offered, and he never refused, to lease only the Carters' mineral interest.  Rather, the offer included both the Carters' and Texas Outfitters' interests.

3

alternative settlement offers to the Carters in October 2010 and May 2011.[2]  Neither was accepted.

The Carters sued Texas Outfitters and Fackovec in June 2011.  They alleged that Texas Outfitters, as holder of the executive rights to the Carters' mineral interests, breached the duty of utmost good faith and fair dealing by refusing to enter the El Paso lease.  After the Carters filed suit, Texas Outfitters received two more offers to lease the ranch's minerals.  The first included a larger bonus than the El Paso offer—$2,000 per acre—but was withdrawn when the lessee learned El Paso had already leased the Hindeses' interest.  The second included a $1,500-per-acre bonus and was also withdrawn by the lessee.

Ultimately, drilling in the area revealed that the land was not as productive as anticipated, and Texas Outfitters received no further lease offers.  In 2012, Texas Outfitters sold the ranch for approximately $3.5 million,[3] retaining a portion of the mineral interest.

After a bench trial, the trial court rendered judgment for the Carters and against Texas Outfitters, awarding damages of $867,654.32—the amount the Carters would have received in bonuses from El Paso had its lease offer been accepted—plus interest and costs.[4]  The trial court made numerous findings of fact and conclusions of law, including the following:

---

[2] Per the first offer, Texas Outfitters would receive a 25% mineral interest (replacing its 4.16% interest), the Carters would receive the executive rights on their remaining 25% interest, and Texas Outfitters would make a $275,000 loan payment upon execution of the El Paso lease.  Under the second offer, the Carters were given the option of either (1) purchasing the ranch from Texas Outfitters, including all surface and mineral interests, for $4.2 million, or (2) conveying a 25% mineral interest to Texas Outfitters in exchange for the executive rights on the Carters' retained interest.

[3] The court of appeals stated that the ranch was sold for $4.5 million, which appears to be based on testimony from Fackovec that $3.5 million was a "net figure."  The exact sale price is unclear from the record.

[4] The Carters sought to hold Texas Outfitters and Fackovec jointly and severally liable for their damages.  The trial court held that Fackovec was not personally liable on the Carters' claims, and the Carters have never challenged this portion of the judgment.

- Texas Outfitters exercised its executive rights to both its own mineral interest and the Carters' mineral interests in refusing to enter a lease with El Paso.

- Fackovec's "stated reason for refusing the lease was because he wanted to see how the play matured and try to get more money."

- "Dora Jo Carter testified that [Fackovec] told her that he planned not to lease because of his business of a hunting lease for bringing in hunters."

- After suit was filed, Texas Outfitters received a subsequently withdrawn lease offer that included a bonus of $250 more per acre than the El Paso lease. This would have amounted to $11,252.80 more for Texas Outfitters, while refusing the El Paso lease caused the Carters to lose $867,654.18.

- Texas Outfitters' "willingness to gamble its 4.16% [mineral interest] also resulted in a gamble for the Carter Family of their 45.84%."

- Texas Outfitters would not have purchased the ranch without the executive rights.

- Texas Outfitters sold the ranch "free of the encumbrance of any oil and gas lease" for $2.5 million over the purchase price.

- A holder of executive rights owes a "duty of utmost fair dealing" to the non-executive, and the "duty is breached by self-dealing."

- If an executive's refusal to lease minerals "is motivated by self-interest to the non-executive's detriment, the executive may have breached his duty."

- Refusing to lease in order to obtain more bonus money "could not be said to be self-dealing in and of itself" because more bonus money "would have benefitted the non-executive as well."

- However, Texas Outfitters "chose to gamble" with both its interest and the Carters' interest "when [Fackovec] knew that they did not want to gamble."

- Texas Outfitters took this gamble with knowledge that the Hindeses had already leased to El Paso, which "unfavorably affected" the "pool of potential lessees."

- "By refusing to lease," Texas Outfitters gained "unfettered use of the surface for its hunting operation, which was always the plan for the property," as well as "the ability to sell its land at a large profit free of any oil and gas lease."

5

- Texas Outfitters breached its duty of utmost fair dealing to the Carters in refusing to enter the lease offered by El Paso.

The court of appeals affirmed, holding that "the evidence supports a finding that Texas Outfitters refused to execute the El Paso lease based on its arbitrary and self-motivated refusal to permit *any* lease for the purpose of protecting its use of the surface and to exact a benefit from the Carters [e.g., the note reduction and deed restrictions] to their detriment." 534 S.W.3d 65, 80 (Tex. App.—San Antonio 2017). We granted Texas Outfitters' petition for review.

## II. The Executive Duty

The executive right—one of the "bundle of sticks" inherent in mineral ownership—encompasses the right to execute oil and gas leases. *Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 480–81 (Tex. 2011). When the executive right is "severed from other incidents of mineral ownership," *id.* at 487, issues often arise as to the nature of the duty owed to the non-executive mineral- or royalty-interest owner. We have described the parameters of this duty as "difficult to determine," "imprecise," and unsusceptible to a "bright line rule." *Id.* at 488; *Bradshaw*, 457 S.W.3d at 74. However, we have articulated several guiding principles.

First, we have stated that the duty does not require an executive to subjugate his interests to those of the non-executive; rather, the executive must "acquire for the non-executive every benefit that he exacts for himself." *Bradshaw*, 457 S.W.3d at 81 (quoting *Lesley*, 352 S.W.3d at 490). We applied these "no-subjugation" and "equal-benefits" principles in *Manges v. Guerra*, in which Manges owned a mineral interest in co-tenancy with Guerra and also exclusively owned all the executive rights. 673 S.W.2d 180, 181–82 (Tex. 1984). Among other things, Manges leased the mineral interest to himself on favorable terms, as the lease provided for a mere $5 bonus for Guerra. *Id.* at 182. We held that Manges breached his duty to Guerra "in making the

6

lease to himself, in agreeing upon a $5 nominal bonus for 25,911.62 acres of land, and in dealing with the entire mineral interest so that he received benefits that the non-executives did not receive." *Id.* at 184.

Second, in *Lesley* we rejected the argument that an executive is wholly shielded from liability for inaction, i.e., failure to lease, noting that if an executive's refusal to lease upon request "is arbitrary or motivated by self-interest to the non-executive's detriment, the executive may have breached his duty." 352 S.W.3d at 491. However, we stopped short of articulating a general rule governing liability for refusing to lease because the executive's conduct in that case went beyond such inaction. *Id.* Specifically, the executive in *Lesley*, a subdivision developer that owned the surface and part of the mineral estate, as well as all the executive rights, imposed restrictive covenants constraining mineral development in the subdivision to protect future lot owners. *Id.* at 481. We held that the executive breached its duty by imposing limitations on future leasing that benefitted its interest in the surface estate to the detriment of the mineral interest owners. *Id.* at 491.

Most recently, in *Bradshaw* we synthesized our previous discussions of the contours of the executive duty to provide "the controlling inquiry" in ascertaining whether an executive breached his duty to a non-executive: "whether the executive engaged in acts of self-dealing that unfairly diminished the value of the non-executive interest." 457 S.W.3d at 82. In doing so, we recognized the utility of the no-subjugation and equal-benefits principles, while clarifying that they cannot be applied in a vacuum and must account for the fact that executives and non-executives often "do not share in all the same economic benefits that might be derived from a mineral lease." *Id.* at 83. For example, the *Bradshaw* executive held "the right to obtain

7

benefits, such as bonuses and delay rentals, in which the non-executive ha[d] absolutely no interest." *Id.*[5] The non-executive alleged that, in executing the lease, the executive agreed to a lower shared royalty rate in exchange for an enhanced bonus for itself. *Id.* We held that such conduct, if proved, was "the essence of self-dealing" because the executive "misappropriated what would have been a shared benefit . . . and converted it into a benefit reserved solely for itself." *Id.*[6] And the developer in *Lesley* did not merely act to benefit its surface interest; it did so in a manner that unfairly harmed the non-executive mineral owners' interests. 352 S.W.3d at 491.

That said, we continue to recognize that evaluating compliance with the executive duty is rarely straightforward and is heavily dependent on the facts and circumstances. However, with *Bradshaw*'s "controlling inquiry" in mind, we turn to the instant case.

---

[5] As discussed further in Section IV(C), this divergence of positions is even starker when the executive's primary interest is the surface and the non-executive's sole interest is maximizing mineral development.

[6] We did not abandon the equal-benefits and no-subjugation principles in *Bradshaw*, but instead recognized that, under certain circumstances, they may continue to provide guidance when applying *Bradshaw*'s controlling inquiry. For example, an executive who usurps a shared benefit (say, obtains an increase in his own royalty interest but not in the non-executive's royalty interest) would necessarily engage in self-dealing to the non-executive's detriment and thus breach his duty. *See Bradshaw*, 457 S.W.3d at 83. If, on the other hand, the executive obtains a benefit to which the non-executive has no legal entitlement (say, as in this case, a benefit for the surface interest), the equal-benefits principle does not necessarily apply, and the executive violates his duty only if, by obtaining a benefit to which the non-executive is not legally entitled, the executive engages in self-dealing that unfairly harms the non-executive's interest under *Bradshaw*. In short, the executive must acquire for the non-executive every benefit he exacts for himself when that benefit affects a shared interest, as the failure to obtain the benefit for the non-executive necessarily harms the non-executive's interest under those circumstances. When the benefit affects an interest that belongs solely to the executive, he need not necessarily acquire that same or any other benefit for the non-executive, but he must not unfairly harm the non-executive's interest in obtaining it.

By the same token, the no-subjugation principle establishes that the executive duty does not globally require executives to subjugate their interests to those of the non-executives. It confirms that an executive need not *always* subjugate his interest to the non-executive's interest and does not *necessarily* violate his duty by failing to place the non-executive's interest above his own. But if by acquiring a benefit solely for himself the executive would unfairly harm the non-executive's interest, the executive must decline that benefit and, in that sense, must subjugate his interest to the non-executive's interest.

8

### III. Standard of Review

A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Texas Outfitters argues that the evidence is legally insufficient to support the trial court's ultimate finding that Texas Outfitters breached its executive duty to the Carters by refusing to execute the El Paso lease.[7] A legal sufficiency challenge fails if more than a scintilla of evidence supports the finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

### IV. Analysis

### A. The Proper Standard

As an initial matter, we note that the court of appeals in this case recognized *Bradshaw*'s holding regarding the controlling inquiry for examining whether an executive breached his duty—whether the executive engaged in acts of self-dealing that unfairly diminished the value of the non-executive interest—but concluded that *Bradshaw* applies only in the context of an executive's affirmative execution of a lease. *See* 534 S.W.3d at 71. The court went on to hold that *Lesley* sets forth the appropriate standard in the refusal-to-lease context. *See id.* (citing *Lesley* for the proposition that an executive may breach his duty if the refusal to lease "is arbitrary or motivated by self-interest to the non-executive's detriment"). Texas Outfitters argues that the court of appeals mischaracterized *Bradshaw*, which created a single standard governing the executive duty. The Carters respond that the court of appeals properly engaged in

---

[7] The trial court labeled this finding as a conclusion of law, but we are not bound by that designation and may treat it as a finding of fact subject to the appropriate standard of review. *Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607, 608 n.1 (Tex. 1979).

a fact-specific analysis and correctly held that Texas Outfitters breached its duty regardless of which "test" is used.[8]

To the extent the court of appeals depicted *Bradshaw* and *Lesley* as creating independent, exclusive standards depending on whether the challenged conduct consists of leasing or refusing to lease, we disagree and reject that characterization. We did not purport to set forth a general rule in the refusal-to-lease context in *Lesley*, and we did not purport to overrule prior precedent in *Bradshaw*. Rather, in *Bradshaw* we meticulously recounted and relied on our executive duty jurisprudence, including *Lesley*, in order to distill and clarify what we have determined is the "controlling inquiry" in these cases. *Bradshaw*, 457 S.W.3d at 80–82. We rely on that same jurisprudence here.

### B. The Trial Court's Findings

Turning to the facts at hand, the trial court's written findings provide the basis for its conclusion that Texas Outfitters breached its executive duty. As noted, the principal findings are: by refusing the El Paso lease, Texas Outfitters "chose to gamble" with both its own mineral interest and the Carters' much larger interest knowing that the Carters did not want to take that gamble; Texas Outfitters refused the El Paso lease knowing the Hindeses had already leased their 50% interest to El Paso, thereby diminishing the potential pool of lessees; and refusing the lease allowed Texas Outfitters to retain unfettered use of the surface to operate its planned hunting operations and to sell the ranch at a profit free of any encumbrances.

---

[8] In a brief footnote, the court of appeals held in the alternative that "an executive who unsuccessfully engages in acts of self-dealing to the non-executive's detriment breaches its duty under [*Bradshaw*] as does an executive who successfully engages in acts of self-dealing that unfairly devalues the non-executive's interest." 534 S.W.3d at 78 n.4.

Texas Outfitters argues that, as a matter of law, it cannot have engaged in self-dealing merely by "gambling" on better lease terms that ultimately did not materialize. It argues that the court of appeals erroneously went beyond these findings and held that Texas Outfitters breached its duty by "refusing to execute *any* lease, including a lease with El Paso, in order to protect its existing use of the surface." 534 S.W.3d at 77 (emphasis added). We agree with Texas Outfitters that an executive generally does not breach his duty by declining a lease in honest anticipation of obtaining better terms for all.[9] We also agree that the trial court in this case did not go so far as to find that Texas Outfitters refused to execute any lease.[10] But the trial court did find that the refusal to execute the El Paso lease was a much larger gamble with respect to the Carters' interest (and one Fackovec knew they did not want to take), that Texas Outfitters took this gamble knowing the pool of potential lessees had been diminished, and that refusing the lease benefitted Texas Outfitters' surface interest to the Carters' detriment. The trial court further recognized that protection of the surface interest was important to Texas Outfitters in light of its insistence on acquiring the executive rights as part of the ranch's purchase and its longstanding plan to use the ranch for hunting. We therefore read the trial court's findings to

---

[9] Analogously, the business judgment rule "generally protects corporate officers and directors, who owe fiduciary duties to the corporation, from liability for acts that are within the honest exercise of their business judgment and discretion." *Sneed v. Webre*, 465 S.W.3d 169, 173 (Tex. 2015).

[10] The court of appeals also concluded that the breach-of-duty finding was supported by the parties' settlement negotiations, which indicated that Texas Outfitters "refused to permit any lease unless the Carters agreed either to convey a portion of their royalty interest or to accept deed restrictions (i.e. restrictive covenants) and a $263,000 reduction on the note." 534 S.W.3d at 77–78. This too goes beyond the trial court's findings and does not appear to have formed the basis for its judgment. Indeed, the Carters submitted proposed findings to the trial court to the effect that (1) Fackovec "personally told Dora Jo Carter he would flatly refuse to sign an Oil and Gas Lease" and (2) Fackovec demanded "consideration beyond the terms of the Mineral Deed, as a condition of executing an Oil and Gas lease." The trial court did not include these and instead issued the findings described above. Other than the ultimate finding of breach, neither party challenges those findings or complains that they are unsupported. *Cf. Burford v. Pounders*, 199 S.W.2d 141, 145 (Tex. 1947) ("The rule that supplemental findings necessary to support the judgment are presumed, has no application when the findings and conclusions disclose the basis therefor, and that the court did not find such necessary supplementary facts.").

11

include a determination that Texas Outfitters refused the El Paso lease to benefit[11] its surface interest.[12]

## C. Violation of the Executive Duty

But does Texas Outfitters' conduct, as found by the trial court, rise to the level of "self-dealing that unfairly diminishe[d] the value of the [Carters'] non-executive interest"? *Bradshaw*, 457 S.W.3d at 82. Considering the historical context in which the executive duty arose, applying it becomes particularly difficult when, as in the instant case, one person owns the surface estate and either no associated mineral interest or a very small one, along with the executive right to another person's much larger mineral interest underlying that surface estate.[13] Commentators generally agree that the executive right originated "in response to the fractionalization of the mineral fee interests so as to ease the leasing of oil and gas" by "provid[ing] potential lessees with the benefit of only having to wrangle over one lease instead of many." Christopher Kulander, *Big Money vs. Grand Designs: Revisiting the Executive Right to Lease Oil & Gas Interests*, 42 TEX. TECH. L. REV. 33, 34 (2009). In this state of affairs, the interests of the executive and non-executive will largely align. Conflicts may of course still arise, as they do, for example, when only the executive is entitled to bonuses and delay rentals. *See, e.g.*, *Bradshaw*,

---

[11] The controlling inquiry we clarified in *Bradshaw* and apply here addresses circumstances in which an executive allegedly breaches his duty by acquiring a benefit for himself. We have not addressed the circumstances in which an executive might breach the duty by unfairly harming the non-executive's interest even though the executive receives no benefit. Because this case does not present that issue, we do not address it here.

[12] As the court of appeals noted, this is consistent with the trial court's oral statement at the trial's conclusion that "[i]t appears to the Court that Mr. Fackovec's real motive was that he did not want his surface to be burdened by an oil and gas lease; and in fact, that did bear fruit for him in that during the pendency of this case he was able to sell his property free of an oil and gas lease."

[13] To the extent uncertainty exists as to whether ownership of an executive right absent any associated mineral or royalty interest is permissible, we need not address it here because Texas Outfitters owned both the executive right and an associated mineral interest. *See* Monika U. Ehrman, *One Oil and Gas Right to Rule Them All*, 55 HOUS. L. REV. 1063, 1066 (2018) (noting that few cases involve an executive without an associated mineral or royalty interest).

457 S.W.3d at 83.  However, the executive and non-executive are presumably united, at least generally, in their desire to maximize the value of the mineral estate.

By contrast, a property purchaser primarily interested in the surface may acquire the executive right in order to protect that surface investment.  Kulander, *supra* at 34–35.  This scenario, presented here, gives rise to the potential for a significant conflict between the interests of the executive who favors the surface and those of the non-executive who favors the mineral estate.  *See* Christopher S. Kulander, *The Executive Right to Lease Mineral Real Property in Texas Before and After* Lesley v. Veterans Land Board, 44 ST. MARY'S L.J. 529, 567–68 (2013) ("If the executive rights holder has an interest in ensuring the minerals remain undeveloped, such as in *Lesley*, a temptation may arise to put self-interest ahead of the interest of the mineral cotenants—a situation incompatible with the duties of a fiduciary.").  As indicated above, the parties' divergent legal positions make it difficult to determine when such an executive crosses the line from lawfully promoting his own surface interest to unlawfully doing so at the expense of the non-executive interest, thereby engaging in self-dealing that unfairly diminishes the value of that interest.

We addressed these competing considerations to some extent in *Lesley*, in which the developer—who, like Texas Outfitters, owned the surface estate, a portion of the mineral interest, and the executive rights to the remaining mineral interests—argued that it could not have breached its duty to the non-executive mineral owners because the restrictive covenants that curtailed future leasing burdened all mineral interests equally (including the executive's) and benefitted only the executive's interest in the surface estate.  352 S.W.3d at 491.  In rejecting this argument, we reasoned in part that "the common law provides appropriate protection to the

13

surface owner through the accommodation doctrine."[14]  *Id.* at 492.  We thus implied that an executive surface owner who engages in conduct that burdens the mineral interest to the benefit of the surface, notwithstanding existing legal safeguards, is at particular risk of violating his executive duty.

In turn, while we cannot and do not say that an executive primarily interested in the surface necessarily breaches his duty by engaging in conduct that benefits the surface but not the mineral estate,[15] we conclude that legally sufficient evidence supports the trial court's finding that Texas Outfitters did so in this case.  The Carters presented evidence that it was "common" for owners in the area who used their land for commercial deer hunting to enter into oil and gas leases with operators who accommodated the surface use.  Yet Texas Outfitters chose to reap the benefits of an unburdened surface estate to the Carters' detriment.  And, importantly, the harm was not limited to the lost bonuses from one refused lease.  Texas Outfitters declined the lease offer with knowledge of the Hindeses' lease with El Paso, which the trial court found had "unfavorably affected" the pool of potential lessees.  That finding was borne out by evidence that a subsequent lease offer was withdrawn precisely because El Paso had already leased the remaining 50% mineral interest.  This constitutes some evidence that Texas Outfitters engaged in acts of self-dealing that unfairly diminished the value of the Carters' mineral interest.

---

[14] A lessee is liable for failing to accommodate the existing use of the surface if "(1) the lessee's use completely precludes or substantially impairs the existing [surface] use," "(2) there is no reasonable alternative method available to the surface owner by which the existing use can be continued," and (3) "there are alternative reasonable, customary, and industry-accepted methods available to the lessee which will allow recovery of the minerals and also allow the surface owner to continue the existing use."  *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 249 (Tex. 2013).

[15] As noted, the equal-benefits principle does not apply under such circumstances because the non-executive is not entitled to share in the surface benefit.

14

Our holding exemplifies the importance of the particular facts and circumstances in evaluating an executive's conduct. Here, the fact that El Paso had already leased the Hindeses' interest impacted the propriety of Texas Outfitters' decision to refuse a lease offer from the same lessee. That is, Texas Outfitters "gambled" on a better lease offer despite knowing the circumstances that made such an offer unlikely. And as the trial court further found, this amounted to a much bigger risk for the Carters than Texas Outfitters given the size of their respective mineral interests.

Texas Outfitters notes that El Paso never offered to lease only the Carters' mineral interest and argues that it should not be "forced" to lease its own interest to avoid breaching its executive duty. We reject this argument for two reasons. First, as an evidentiary matter, the trial court sustained the Carters' objections to Fackovec's trial testimony regarding his willingness to lease only the Carters' interest and El Paso's refusal to do so. Texas Outfitters does not complain about these rulings on appeal.

Second, and more importantly, the fact that El Paso's offer was to lease both the Carters' and Texas Outfitters' mineral interests is not dispositive; it is simply one of the facts and circumstances under review. The trial court concluded that Texas Outfitters' failure to lease its own interest along with the Carters', in light of all those facts and circumstances, was a breach of its duty. We certainly do not hold that an executive must always accept an offer to lease both the executive's and the non-executive's mineral interests when the non-executive wishes to accept. But we also do not hold that an executive is never required to accept such an offer. By purchasing executive rights, Texas Outfitters also purchased the corresponding duty of utmost

good faith and fair dealing. The evidence is legally sufficient to support the trial court's finding that Texas Outfitters breached that duty by refusing the El Paso lease.

## V. Conclusion

This case demonstrates yet again the fact-dependent nature of executive duty inquiries. Under our jurisprudence, the Carters had the burden to show that Texas Outfitters engaged in acts of self-dealing that unfairly diminished the value of the Carters' non-executive interest. That burden was met here. Because more than a scintilla of evidence supports the trial court's finding that Texas Outfitters breached its executive duty, we affirm the court of appeals' judgment.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** April 12, 2019