

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| KEYVAN PARSA, M.D. | § | No. 08-23-00134-CV |
|---|---|---|
| Appellant, | § | Appeal from the |
| v. | § | 41st Judicial District Court |
| ALBERT FLORES, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2020DCV2997) |

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment in favor of appellee, Albert Flores, that ordered defendants, Keyvan Parsa and Montoya Park Place, Inc., to pay Flores actual damages, punitive damages, and attorney's fees. Only Parsa appeals, raising three issues challenging the factual sufficiency of the evidence that Parsa (1) breached a contract with Flores, (2) defrauded Flores, and (3) was unjustly enriched. We affirm.

## BACKGROUND

This case arises out of the sale of real estate, and more particularly, a dispute over the division of the sale proceeds between the parties who developed the property. Flores sued Parsa and Montoya Park Place for, among other claims, a declaratory judgment of unjust enrichment, fraud in a real estate transaction, equitable subordination, fraud in a stock transaction, unjust

enrichment in a stock transaction, breach of contract, fraudulent transfer, and common law fraud. The case was tried to the trial court. Because we conclude the evidence is factually sufficient to support the trial court's conclusion that Flores committed common and statutory fraud, this opinion addresses only the facts relevant to that claim.[1]

### A. Flores's trial testimony

Flores and his cousin inherited a parcel of land in El Paso's upper valley and later sold it to Johannsen Development Group, Inc. (JDG). The cousin took cash from the sale but Flores accepted JDG's $437,000 promissory note which was payable in a lump sum in six months. When JDG defaulted on that note, Flores allowed JDG to refinance. The refinancing lender, Right Immix Capital, Inc. (RIC), lent JDG $700,000. The loan was secured by the land. Flores agreed to subordinate his lien on the land to RIC's lien. After a time, JDG again defaulted on Flores's note, and Flores began foreclosure proceedings.

Parsa was a shareholder in JDG. During the foreclosure proceedings, Parsa approached Flores with a proposal that they form a corporation and market the land together. As a part of that arrangement, Flores foreclosed on his lien, bidding $450,980 for the land. In February 2020, Flores and Parsa formed Montoya Park Place for the purpose of developing the land and Flores conveyed his title to the land to Montoya Park Place. Flores never signed the RIC note, but he began making payments on the note because Parsa was having cash-flow problems. Flores made six to eight payments totaling approximately $18,000, and assumed he would be reimbursed that advance from the proceeds of the sale of the land.

---

[1] Additional background facts may be gleaned from our opinion in *Parsa v. WestStar, LLC*; No. 08-23-00135-CV, 2024 WL 688258 (Tex. App.—El Paso, February 20, 2024, no pet. h.) (mem. op.). We repeat some of the facts from that opinion and provide additional background related to this appeal.

Several months later, Montoya Park Place secured a buyer—IDEA Public Schools—who agreed to buy the property for $1,950,000. The transaction closed on July 1, 2020, when Flores signed the closing documents at WestStar Title (Parsa had signed the day before). WestStar released a net amount of $1,829,295.40 to Montoya Park Place. Flores noticed that $722,000 of that amount should have been paid to RIC to pay-off its note and release the first lien, but the sum was mistakenly included in the sale proceeds to Montoya Park Place. The sale proceeds were wire transferred to a bank over which only Parsa had control.

On July 2nd, Flores went to Parsa's office and stated that they had been overpaid by the amount that should have been paid to RIC. Parsa responded that he had already lost too much money in the deal and that the title company was liable for the overpayment. Because Flores was uncomfortable with Parsa's response, he decided he wanted "out of [Montoya Park Place] because [he] didn't want to be included in that." Flores then told Parsa he wanted his "share of the sale proceeds only," which he calculated to be $571,173.09. That sum was comprised of one-half of the sale proceeds not including the $722,000 windfall, and an additional $18,000 that Flores had advanced as payments on the RIC note.

Parsa then asked him how much he needed right away. Flores quickly calculated that he needed $280,000 of that amount "right away and then [Parsa] can pay" him "the rest afterwards." Flores testified that he discussed with Parsa what the balance of the money owed to Flores was due and they came to an agreement on that. Parsa promised to get Flores the $280,000 "[i]n a little while" saying "[g]ive me some time."

Flores went back to Parsa's office on July 6 and received a cashier's check for $280,000. Flores asked when he would get that rest of his share and was again told "in a little while"—"Give me some time." Flores went back to see Parsa on July 10 looking for the balance of his share. In

3

that conversation, Flores again told Parsa that keeping the $722,000 windfall was a bad idea because he had learned that the title insurance protected the buyer, and not the seller. At that meeting, Parsa presented Flores a stock purchase agreement whereby Flores would sell his shares in Montoya Park Place to Parsa for $50. Flores said he thought the agreement was unnecessary because no stock had ever been issued, but he agreed to sign the agreement because he wanted the balance of the money owed to him. The agreement is dated July 1, 2020, but Flores testified that he actually signed it on July 10. According to Flores, at this meeting and before signing the stock purchase agreement, he asked Parsa when he would be paid the rest of his money, and was again told, "Give me a little time." Flores said that throughout the summer of 2020 he continued to press Parsa for his share of the sale proceeds and was continually told "In a little while." "Just give me some time."

By the middle of July, Flores started to receive demands for payment of the note and demands by WestStar and Fidelity to return the $722,000. In September 2020, Flores filed suit against Parsa to appoint a receiver for Montoya Park Place that could pay Flores his share of the sale proceeds and return the $722,000 overpayment. Parsa's response to the suit asserted that the stock purchase agreement ended any future payment obligations to Flores. Based on the assertion of this defense, Flores later asserted statutory and common law fraud claims that we discuss below.

**B. Parsa's trial testimony**

Parsa conceded that he and Flores initially agreed to develop the land and split any profit fifty-fifty. Parsa admitted that he told the company that serviced the RIC note that he and Flores would continue to make payments on the note after Flores foreclosed on the property. He also conceded that Montoya Park Place was overpaid by $722,949.22 at closing. However, he did not recall refusing to pay RIC the $722,949.22. Parsa claimed that to the best of his knowledge, Flores

closed on the land sale and then, pursuant to the stock purchase agreement, signed over his interest in Montoya Park Place on July 1, 2020. Parsa said he and Flores verbally agreed to the stock purchase agreement before the July 1st closing date but did not disclose it to the title company because they thought the title company would delay the closing.

Parsa denied that Flores asked for anything more than the $280,000 that he was paid and the $50 consideration for his shares. He denied all the conversations where it was claimed Parsa put Flores off by asking for "a little time." According to Parsa, although the net proceeds from the sale of the land was $1,829,295.40, Flores only wanted the return of his original $280,000 investment. When asked if $1,829,295.40 was "an awful lot of money for Mr. Flores only to want 280,000," Parsa replied that Flores "made the decision prior than that. It's too late now."

Parsa claimed that he did not receive any money from the sale of the land, but he admitted Montoya Park Place loaned $1,461,586.89 (the balance of the sale proceeds) to Westmount Group, Inc. Parsa prepared the promissory note himself and signed it as President of Westmount. Westmount then used the money to purchase money market certificates in the name of Westmount.

### C. The trial court's judgment

In addition to the testimony from Flores and Parsa, the trial court admitted many exhibits, took evidence on attorney's fees, and took notice of its multiple prior hearings in the case. It signed a judgment that awarded Flores $240,000 in actual damages,[2] $100,000 in punitive damages, and $100,000 in attorney's fees.[3]

---

[2] Flores had requested more. He calculated his actual damages as $291,173.09 as follows: net sales proceeds in the amount of $1,829,295.40 less the $722,949.22 owed to RIC, which equaled $1,106,346.18 to be divided by half equaling $553,173.09, plus the $18,000 he paid on the RIC note, less the $280,000 he received.

[3] Parsa does not challenge the award of punitive damages or attorney's fees, other than to attack the underlying basis for claims they are predicated on.

On request, the trial court entered findings of fact and conclusions of law. The pertinent findings include:

4.  All Closing documents were prepared, and Defendant Parsa attended a closing on June 30, 2020.

5.  Defendant Parsa received a check for the full purchase price because the title company overlooked the Right Immix Note. The overpayment was approximately $ 720,000.00.

6.  Parsa had full knowledge of the Right Immix lien which he personally had guaranteed and knew the overpayment was occurring.

7.  Flores was out of town on June 30, 2020, and went to the title company the following day, July 1, 2020, to add his signature to the closing documents.

8.  After learning of the overpayment, Flores urged Parsa to pay the excess back to the title company so that the Right Immix Capital lien could be paid off.

9.  Parsa refused to do so.

10. After repeated unsuccessful efforts to convince Parsa to repay the excess payment, Flores's lawyer Bud Kirk sent Parsa a letter on July 24, 2020 (Exhibit O) imploring him to do so and advising him of the doctrine of unjust enrichment.

11. Parsa still refused to refund the excess payment.

12. It is unclear where the proceeds of the sale were kept. There is some evidence that Parsa opened an account at Western Heritage Bank. He also told Flores the money had been moved to Mexico. At some point, they were apparently deposited in an account owned or controlled by Westmount Group Inc. (an entity apparently controlled by Parsa which filed for Bankruptcy), and they were also deposited in Wells Fargo CD's.

13. The Court Ordered the funds to be deposited into the registry of the Court, but that never occurred.

14. Flores wished to terminate all business relations with Parsa, have the [RIC] loan paid, and receive his net proceeds from the sale of Tract 3.

15. Parsa told Flores he would pay him soon and asked how much he needed "right now." An agreement was reached to pay Flores an initial payment of $280,000.00, with the understanding that the remainder was to be paid "soon."

6

16. To effectuate the termination of the business relationship between Parsa and Flores, Parsa prepared a "STOCK PURCHASE AGREEMENT." (Exhibit M)., which purports to sell all of Flores's stock to Parsa for $50.00. This document states that the sale will close on July 1, 2020, even though it was obviously prepared well after that date.

Conclusions of Law

1. Parsa made multiple false statements [to] Flores, which Parsa knew at the time were false. Flores relied to his detriment on those statements. Fraud was committed.

The trial court also made findings on breach of contract and unjust enrichment which we need not decide in light of the fraud claims discussed below. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## FLORES'S FRAUD CLAIMS

Among the theories he prevailed on at trial, Flores alleged Parsa committed fraud. He pleaded both a common law fraud claim, and a statutory fraud claim under TEX. BUS. & COM. CODE ANN. 27.01. Some specific allegations overlap between the two:

(1) Parsa obtained Flores's signature on the "Stock Purchase Agreement" through false representations of existing material facts, including that Parsa intended to pay the balance of his interest by saying "In a little while. Give me a little time";

(2) Parsa promised he would handle the bank account for Montoya Park Place impartially and according to their mutual wishes, Flores relied upon this representation to his detriment because Parsa managed the account to the exclusion of Flores and appropriated all but $280,000 of the legitimate sale proceeds to himself; and

7

(3) Parsa misrepresented that he would pay Flores his share of the sale proceeds "in a little while," which Flores relied upon to his detriment because he "desperately needed the $280,000."

## A. Applicable law

A fraud cause of action requires: (1) a material misrepresentation that (2) was false, (3) was either known to be false when made or was asserted without knowledge of its truth, (4) was intended to be acted upon, (5) was relied upon, and (6) which caused injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). Section 27.01 of the Texas Business and Commercial Code provides a statutory cause of action for fraud in real estate transactions. *See* TEX. BUS. & COM. CODE ANN. § 27.01. The elements of the statutory claim require a showing that (1) a person makes a false representation of a past or existing material fact in a real estate transaction to another person for the purpose of inducing the making of a contract; and (2) the false representation is relied on by the person entering into the contract. *Id.* at § 27.01(a)(1)(A), (B). Under § 27.01, the person who made the false representation is liable to the person defrauded for "actual damages" as well as "reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court." *Id.* at § 27.01(b), (e). If the false representation is made with actual awareness of its falsity, exemplary damages may also be recovered. *Id.* at § 27.01(c).

"Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006). Accordingly, the fact-finder is permitted to draw reasonable inferences from the direct and circumstantial evidence. *Zaragoza v. Jessen*, 511 S.W.3d 816, 823–24 (Tex. App.—El Paso 2016, no pet.). Mere breach of a contract is no evidence the

party did not intend to abide by it. *Chapa*, 212 S.W.3d at 305. Nor does denial of the alleged promise prove fraudulent inducement. *Id*. But breach of an agreement combined with "slight circumstantial evidence" of fraud is enough to support a verdict for fraudulent inducement. *Id*.; *see also Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774–75 (Tex. 2009) (While breach of the contract alone is not evidence that a party did not intend to perform, "breach combined with 'slight circumstantial evidence' of fraud" is some evidence of fraudulent intent, enough to support a verdict.). And a "party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

## B. Standard of review

This case comes to us from a bench trial where the trial judge entered findings of fact and conclusions of law. "A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Texas Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). "Generally, a trial court's findings of fact are not binding on a court of appeals where[, as here,] a complete reporter's record is part of the record on appeal." *Pearl Res. LLC v. Charger Servs., LLC*, 622 S.W.3d 106, 115 (Tex. App.—El Paso 2020, pet. denied). "However, if the trial court's findings of fact are not challenged by a point of error on appeal, the appellate court is bound by them." *Id.* When challenged, they may be reviewed for legal and factual sufficiency by the same standards as evidence supporting a jury's answer. *Id.*

When, as here, the party complaining of factual insufficiency did not have the burden of proof at trial, we conduct our review by considering all the evidence in the record both for and against the finding. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Getosa, Inc. v. City of El Paso*, 642 S.W.3d 941, 949 (Tex. App.—El Paso 2022, pet. denied). We can find the

evidence factually insufficient only if we conclude the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. If we find the evidence is factually sufficient, we are not required to detail all the evidence supporting the finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). However, if we find the evidence to be factually insufficient, we must detail all the evidence relevant to the issue and clearly state why the finding is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Id.* We may not pass upon the witnesses' credibility or substitute our judgment for that of the fact-finder, even if the evidence would clearly support a different result. *Id.*

## C. Analysis

On appeal, Parsa focuses his argument primarily on the stock purchase agreement contending no evidence established that he made a materially false misrepresentation that he knew was false at the time and that used to induce Flores to sign the agreement. As for the allegations that he misrepresented he would pay Flores his share of the sale proceeds "in a little while," Parsa asserts (1) there is no evidence he could not pay Flores the "full agreed share of the legitimate sale proceeds" and (2) even if he told Flores the payment would be made "in a little while," there is no evidence Flores relied on that statement or that he was harmed by any reliance.

On appeal, Parsa does not specifically challenge any finding of fact made by the trial court, including that: (1) Flores wanted to "receive his net proceeds from the sale of Tract 3," (2) Parsa told Flores he would pay him soon and asked how much he needed "right now," and (3) "[a]n agreement was reached to pay Flores an initial payment of $280,000.00, with the understanding that the remainder was to be paid 'soon.'"

The evidence of fraud largely came through the testimony of Flores and Parsa, and the many exhibits admitted below. Focusing on the actionable misrepresentations, Flores testified that Parsa agreed to pay his share of the sale proceeds, but kept putting him off (Parsa could pay him "the rest afterwards," "[i]n a little while" and "[g]ive me some time"). Parsa disagreed that Flores's half share was $571,173.09, but the trial court heard and saw the witness testimony and is the proper judge of their credibility. The trial court as the fact-finder could have believed Flores, if nothing else, based on the economic implausibility that he would only want $280,050 from a transaction that he had a 50% interest in and that netted just over a million dollars. Flores had most recently bought the property at foreclosure for $450,950. The record also contains correspondence from Flores' lawyer to Parsa on July 24 that contemplates the split of proceeds between Parsa and Flores was yet to take place—contrary to Parsa's claim that it had already been accomplished on July 1st.

Many of these same considerations bear on falsity of the statement, and present intent to deceive. The trial court's fact-findings include that Parsa was aware of the overpayment by WestStar Title, informed that it should be returned, but refused to do so. He told Flores that he did not intend to return the money because he claimed to have lost too much money on the property. Flores's lawyer wrote Parsa on July 24, explaining why Montoya Park Place had no right to the money, and pointedly told Parsa, "You don't have clean hands. You are wrongfully withholding money that belongs, and should have gone, to others." If Parsa was willing to abscond with those funds, it is no great reach to conclude that in the same transaction and in the same time frame, he intended to shortchange Flores. At the very least, this constitutes the kind of a "slight circumstantial evidence" of fraud coupled with breach of an agreement that would support a finding of fraudulent inducement. *See Chapa*, 212 S.W.3d at 305

There were multiple flash points in the witness testimony. Parsa and Flores disagreed about details of meetings—when they were held, what was said, and payoff of the RIC loan. Parsa's testimony also clashed with a witness who serviced the RIC note who testified that he mailed a demand for payment of the note to Montoya Park Place to Parsa's home address. But Parsa denied knowledge of the demand. The trial court also had before it some evidence that the sale proceeds were shuttled around to different institutions, and *sua sponte* questioned Parsa's credibility over a claim that he had made about those funds.[4] And the trial court made a fact-finding that the stock purchase agreement was not executed on July 1, but at some point later. Yet one of Parsa's claims was that he was free to take control of the sale proceeds on July 2 because the stock purchase agreement on July 1 took Flores out of the picture. And if Flores's view of the meetings and statements are believed, then Parsa was making representations about paying Flores his balance even at the meeting when the stock purchase was presented to Flores, and later, after it was signed.

Bearing in mind that this Court is not a fact-finder, does not pass upon the credibility of the witnesses, or substitute our judgment for that of the fact-finder, we conclude the evidence is factually sufficient to support the implied findings that Parsa made a material misrepresentation to Flores that he would pay Flores his share of the sale proceeds; Parsa knew the misrepresentation was false when made or was asserted without knowledge of its truth; Parsa intended Flores to act upon the misrepresentation by entering into the stock purchase agreement; Flores relied on the

---

[4] THE COURT: Well, yes. I mean, I -- my recollection is that at the time of that hearing, there were -- there was literature from Wells Fargo indicating that if you got out a CD with $10 million, you could get something close to 1 percent.

MR. PEREZ: Uh-huh.

THE COURT: And your client was telling me he was getting 8 to 10 percent, so I had some concerns about his candor to the Court.

misrepresentation by initially only accepting $280,000; and Flores was harmed by the misrepresentation because he never received the amount owed to him.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

JEFF ALLEY, Chief Justice

February 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.