**Opinion issued October 10, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00610-CV

————————————

**ARRABY PROPERTIES, LLC, Appellant**

**V.**

**PAUL BROWN, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-82986**

---

## OPINION

Appellee Paul Brown collided with a cow on a state highway. He sued the

alleged owners of the cow and Arraby Properties, LLC, the owner of the land on

which the roaming cow was alleged to be pastured. Following a bench trial, the trial

court held Arraby Properties, LLC had responsibility for control of the cow and

knowingly permitted the cow to roam at large on the state highway. The trial court awarded damages to Brown.

In five issues, Appellant Arraby Properties, LLC argues (1) there is insufficient evidence or no evidence to support the legal conclusion Arraby owed Brown a duty because Arraby did not own or control the cow, (2) there is insufficient evidence or no evidence Arraby breached a duty to Brown by knowingly permitting the cow to roam at large on the state highway, (3) the trial court abused its discretion in admitting and relying on the testimony of "Brown's unqualified experts" Bob Kingsberry and Floyd Luckett, (4) there is insufficient evidence or no evidence it was foreseeable "the cow would escape," and (5) the "trial court's granular, excessive findings prevented Arraby from properly presenting its appeal."

Because there is legally insufficient evidence supporting the trial court's finding that Arraby was responsible for control of the cow or that it knowingly permitted the cow to roam at large on a state highway, we hold the trial court erred in concluding Arraby owed a duty to Brown under Section 143.102 of the Texas Agriculture Code. We reverse the trial court's judgment and render judgment that Appellee take nothing on his claims.

## Background

Paul Brown is a Houston ship channel maritime pilot. While driving home after work during the early morning hours, Brown struck a cow roaming on State

2

Highway 225 in Harris County, Texas.  Brown appeared to suffer no pressing injury immediately after the crash.  At a doctor's appointment two months later, he reported difficulty concentrating, thinking, and sleeping.  He later reported difficulty concentrating, difficulty sleeping, and inappropriate affect—as well as depression, problems with anger, weakness, headaches, and dizziness.  A neurologist diagnosed Brown with mild cognitive impairment.

Eugene Ybarra and Mary Alice Ybarra (the "Ybarras"), an elderly married couple, lived on a 5.8-acre tract of land ("Property") located a few miles from State Highway 225, near where Brown collided with the cow.  Eugene and Mary Alice purchased the Property in 1973 and for at least five years prior to the accident, they lived in a house on the Property where they kept a "pet cow."  At the time of the accident, the Property was owned by Arraby Properties, LLC, a company owned by Victor Ybarra and Albert Troy Ybarra, two of the Ybarras' children.[1]  In 2016, Eugene and Mary Alice transferred the Property to Arraby via warranty deed, but they continued to live on the Property.

The Property was divided into two parts, with a fence separating the front half of the Property where the house was located, from the back half consisting of undeveloped land generally kept as pasture.  A separate fence enclosed the entire

---

[1]     The Ybarras have eight children, including Troy Ybarra, Victor Ybarra, and Alice Chandler.

Property, with a metal gate at the front entrance. Two days before Brown's accident, a cow was reported missing from the Property.[2] The cow was never recovered.

Brown filed suit against Eugene Ybarra for negligence and gross negligence, claiming Eugene "owned" the cow that "was running at large on the State Highway." Brown alleged that Eugene was liable to him under Texas Agriculture Code Section 143.102 because he owed a "duty to Brown not to permit the cow that he owned from traversing or roaming at-large, unattended, on the right-of way of State Highway 225." Brown further alleged Eugene was liable because Eugene "owed a duty to Brown not to permit the cow that he owned from running at large in Harris County, Texas pursuant to the Harris County stock law and [Texas Agriculture Code Sections] 143.071, et. seq." Brown sought to recover damages for personal injuries and property damage. He also sought recovery of exemplary damages.

Brown later amended his petition to add the same negligence claims against Mary Alice Ybarra, Victor Ybarra, Troy Ybarra, and Arraby.[3] Brown alleged that "he collided with a cow owned by Eugene [] and [Mary] Alice [] . . . and housed on real properly owned by Arraby Properties, LLC, which was running at large on the State Highway." Brown alleged that upon "information and belief" the "cow was

---

[2]    In his closing argument, Brown's counsel stated that the Ybarras' nephew reported the cow missing.

[3]    Brown also added claims for negligence per se, negligent entrustment, respondeat superior, joint enterprise, and later, in his Seventh Amended Petition, he added claims for "contract of agistment" and res ipsa loquitor.

jointly owned by Arraby Properties, LLC and by extension" Troy and Victor. Brown claimed the Ybarras and Arraby owed him a duty under "Sections 143.101-102" and "Sections 143.071, et. seq." of the Texas Agriculture Code to not permit the cow "from traversing or roaming at-large, unattended, on the right-of way of State Highway 225" or "from running at large in Harris County."

Brown later dismissed his claims against Eugene, who passed away, and Mary Alice, who suffered from late-stage Alzheimer's disease, leaving Arraby, Victor, and Troy as the only remaining defendants. Arraby, Victor, and Troy filed a general denial asserting various defenses, including that they were not "the owner[s] of the cow . . . involved in the car accident" and that Arraby "has never owned livestock of any kind."[4] They further alleged that Brown's claims under Section 143.074 of the Texas Agriculture Code were precluded because when an accident involving livestock occurs on a state highway, Section 143.102 provides the exclusive standard.

**The Bench Trial**

The trial court conducted a two-day bench trial. Relevant to the issues on appeal, Victor, his sister Alice Chandler, and Brown's expert witness, Bob

---

[4]    They also alleged that the cow involved in the accident was not "pastured on land owned" by Arraby.

Kingsberry, testified at trial.[5]

## A.     Victor Ybarra

Victor testified that the Property, which Eugene and Mary Alice purchased in 1973, includes a home and a pasture which are enclosed by fences where Eugene and Mary Alice kept their "pet" cow. Eugene and Mary Alice lived on the Property for at least five years before the accident occurred in March 2017. In 2016, Eugene and Mary Alice conveyed the Property to Arraby. When asked if there was a written agreement between Arraby and the Ybarras that "allowed [Eugene and Mary Alice] to keep the cow on the Property and pasture it there," Victor testified:

> It's my parents' house. All they did was sign it over to us. Nothing changed. Like I said, it was their house, their property. They took care of everything. The only thing they did was sign it over to us. That was it.

Victor testified that Eugene "only signed [the Property] over to [Arraby Properties in 2016] just in case something happened to him." "That was it. But nothing changed." According to Victor, Eugene and Mary Alice "maintained everything the way it was" and Eugene's "workers came, cut the grass[,] took care of the fence[, and ] took care of the cow." Victor testified that Eugene and Mary

---

[5]     Other witnesses testified about the nature of the accident and Brown's work and medical condition, including Officer Roger Gonzalez, Dr. Floyd Luckett, M.D., Captain Mark Mitchum, Wallace Stanfill, Lee Wilson, Robert Johnson, Captain Daniel Doty, Kenneth Jones, Sr., Matt White, Brown, and Brown's wife Sheila Brown. Because their testimony is not relevant to the issues on appeal, we do not discuss their testimony in our opinion.

6

Alice were also responsible for paying the Property's taxes after they conveyed the Property to Arraby in 2016. Victor explained that while his father Eugene had some physical limitations, Eugene "still had his mind" and Eugene went to work every day because he "had his restaurant to run." He testified that Arraby does not keep maintenance records with respect to the fences on the Property because Eugene's "workers were the ones who took care of it." According to Victor, Eugene "had people that worked under him" and Eugene would send them to fix the Property's fences, cut the grass, change a light bulb, or address other maintenance concerns on the Property. In addition to his restaurant, Eugene also owned ranches nearby and Eugene employed "workers that handled his ranches," including fixing the properties' fences. Victor added that Eugene "had his companies" and he had "workers that handled his ranches." Those workers "would go fix his fences if . . . [Eugene] saw an issue with it" or "when he heard there was an issue with [the fence]."

When asked if he had a duty to maintain the Property's fences, Victor testified that when Eugene and Mary Alice lived on the Property, he and his seven siblings would visit and "[i]f there's something wrong at the house, we fix it." With respect to the fence, Victor testified that he had no knowledge about "what's required to maintain the fence" because his father "had workers who would take care of it." He testified that he and his siblings "didn't do the animals. I don't do animals." Eugene

7

and Mary Alice also "had people in the back" like "Ray [Gonzalez], who was watching over the property, [and] called the police when he saw [the cow was missing.]"[6] Ray Gonzalez's mother was also on the Property "to watch [Mary Alice and] help her with the house chores and everything."

## B. Alice Chandler

Brown presented the deposition testimony of Alice Chandler, who is Victor's and Troy's sister. Alice testified that Eugene and Mary Alice were not able to take care of a cow. According to Alice, their father Eugene "was not able to walk very well" and had been using a walker for a year before the accident. Alice had been driving Eugene to work because he was no longer able to drive. Alice testified that neither Eugene nor Mary Alice was physically able to go outside to mend fences or make sure the cow was confined to the Property, and it would have been apparent to Victor and Troy that Eugene and Mary Alice were "not best physically or mentally" and unable to care for a cow. According to Alice, her mother Mary Alice had been showing signs of Alzheimer's for six or seven years before the accident, such as forgetfulness and repeating herself.

## C. Bob Kingsbery

Brown presented the deposition testimony of Bob Kingsbery, a livestock fencing expert. Kingsbery testified that he is in the "livestock fencing business as

---

[6] The record reflects that Ray Gonzalez is the Ybarras' nephew.

an international sales manager for a company called Dare Products." Based on his review of affidavits from Victor and Troy, an aerial photograph of the Property, Alice's deposition testimony, and the deposition testimony of Officer Roger Gonzalez,[7] he concluded the cow involved in the accident "escaped from the pasture where [it] was being kept on [the Property]."

Kingsbery was asked to opine based on his "experience, education, and training and the files [he] reviewed," who owned or had responsibility for management of the cow on the Property. He responded:

> Well, as I understand, the property was owned by Arraby. . . [a]nd that's where the cow was before it escaped. And that Mrs. Ybarra, their mother, testified that she and her husband did not own the cow or could not take care of the cow at the time. . . my opinion is that the cow was owned by the owners of the property and they were responsible for managing and taking care of it.

Kingsbery clarified that in referring to Mrs. Ybarra's testimony, he was referring to Mary Alice's discovery responses where she said "[she and Eugene] did not own the cow." He testified, "Well, I haven't seen any evidence that anybody else owned it. And . . . the cow is on somebody's property" and Troy and Victor "stated in their affidavits, that they [knew] the cow was there." Kingsbery thus concluded, "that's

---

[7] Officer Roger Gonzalez is a City of La Porte police officer. He was dispatched to the scene of the accident, and he investigated the accident. His deposition testimony and police report were admitted into evidence at the bench trial.

9

why . . . my opinion is [that] the owners of the property were responsible for . . . managing the cow."

Kingsbery also concluded that Troy and Victor acted "knowingly" in letting the cow roam onto the highway because they knew Eugene and Mary Alice were not "physically able" to check and inspect the fence on the Property, and thus Troy and Victor knew the cow could get out. Kingsbery did not inspect the fence or visit the Property. His conclusion was based on the fact the Ybarras were not physically capable of "inspecting or maintaining the fence." When asked what evidence he had that the fence on the Property was not "being maintained properly," he testified that his opinion was based on "testimony or affidavits, that Mr. and Mrs. Ybarra were responsible for maintaining the fence and that they were physically not capable of doing that."

When asked what evidence he had that Arraby owned the cow, he testified he did not "have any evidence of that." But he followed by stating the "cow was [on] their property and the people that were living there said they did not own it." He stated that "Mrs. Ybarra testified she and her husband did not own a cow."[8] Kingsbery testified that "if somebody's not responsible, or the result of a lease, or something like that, then I would say the property owner would be responsible for

---

[8] In referring to Mary Alice's testimony, Kingsbery clarified he was referring to her discovery responses.

10

the cattle." "Absent some sort of lease or agreement that someone else would be responsible" for livestock, Kingsbery testified that a "landowner is responsible for cattle on its property" if he is aware of the cattle's presence. He thus concluded that in his opinion, Arraby "had control or responsibility for controlling the animal, because they owned the property and . . . their parents, who lived on the property, were not physically capable of . . . caring for a cow."

## D.      Other Evidence

Prior to trial, Arraby, Troy, and Victor filed a motion for summary judgment and in support of their motion, they submitted affidavits from Troy and Victor. During the bench trial, Troy's and Victor's summary judgment affidavits were admitted into evidence as Plaintiff's Exhibit 7 and Plaintiff's Exhibit 8.

Troy stated in his affidavit that his parents Eugene and Mary Alice kept two or three cows on the Property before they conveyed the Property to Arraby in 2016. Eugene and Mary Alice maintained the fencing and the animals on the Property. According to Troy, Eugene and Mary Alice "continued to keep cattle at the property, and they continued to maintain the fencing and the animals" after they conveyed the Property to Arraby in 2016. Troy stated that, as Arraby's Vice President, he "made sure that arrangements had been made with my parents to maintain the fencing for the pasture, which was entirely made of wood, and that my parents would take responsibility to maintain the cow they kept on Arraby land."

11

In his affidavit, Victor stated that Eugene and Mary Alice kept a cow on the Property and they "maintained the fencing for the cow and were responsible to maintain the animal" when they owned the Property. According to Victor, after Eugene and Mary Alice conveyed the Property to Arraby in 2016, they "continued to keep a cow at the [P]roperty, and they continued to maintain the fencing and the animal." Victor further stated that as Arraby's President, he had cooperated with Troy to make sure that "arrangements had been made with my parents to maintain the fencing for the pasture, which was entirely made of wood, and that my parents would take responsibility to maintain the cow they kept on Arraby land."

The trial court also admitted into evidence Mary Alice's amended responses to Brown's interrogatories.[9] The interrogatory responses were admitted into evidence as Plaintiff's Exhibit 27. When asked in an interrogatory to describe any measures she had taken to ensure the Property's fence was secure, Mary Alice stated, "I was allowed to live on the property by my sons. I did not maintain or secure any fence as I am not physically able to maintain this property."

---

[9]    It is undisputed that Mary Alice was suffering from late-stage Alzheimer's when she served her amended interrogatory responses in April 2019. The trial court found that Mary Alice had "advanced stage Alzheimer's dementia disease" and that "Alice saw signs of the disease in her mother from as early as 2010-2011 including forgetfulness and repeating herself." The amended interrogatory responses, served in 2019, do not indicate whether Mary Alice received assistance in collecting the data or the information included in the responses. The verification attached to the interrogatory responses is signed by Mary Alice.

At the conclusion of the bench trial, the trial court held that Arraby was responsible for control of the cow, Arraby knowingly permitted the cow to roam at large on the highway, the cow Arraby controlled was the cow involved in the accident, and Brown suffered damages proximately caused by Arraby's conduct. The trial court awarded Brown $3,174,817 in damages for physical pain and suffering, mental anguish, and loss of earning capacity. The trial court entered a final judgment against Arraby and held that Victor and Troy were not personally liable. This appeal followed.

## Standard of Review

When a party appeals from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the sufficiency of the evidence supporting those findings by using the same standards we use to review jury verdicts. *See Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)); *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When, as here, there is a complete reporter's record, findings of fact are not conclusive, and they are binding only if supported by the evidence. *See BMC Software Belg., N.V.*, 83 S.W.3d at 795; *see also HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

13

When a party attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). In our legal sufficiency review, we credit all evidence and inferences favorable to the trial court's decision if a reasonable factfinder could, and we disregard all evidence contrary to that decision unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 828 (Tex. 2005). We will sustain a no evidence challenge if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Evidence does not exceed a scintilla, however, if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In reviewing a factual sufficiency challenge to a finding on an issue on which the challenging party did not have the burden of proof, we consider and weigh all of

14

the evidence and set aside the verdict only if the evidence that supports the finding is so weak or so contrary to the overwhelming weight of the evidence as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see also Figueroa v. Davis*, 318 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

In a bench trial, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony, and the court may choose to believe one witness over another. *See City of Keller*, 168 S.W.3d at 819. We may not substitute our judgment for that of the trial court. *Id.*; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trial court's credibility assessment, however, must be reasonable and the court "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820.

We review de novo a trial court's conclusions of law, and we will uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V.*, 83 S.W.3d at 794.

## Applicable Law

There is no common-law duty requiring livestock owners to restrain their animals within fences. Livestock owners generally may allow their animals to run at large, rendering Texas a "free-range." *Pruski v. Garcia*, 594 S.W.3d 322, 323

15

(Tex. 2020) ("From the time of the Republic of Texas, the default rule in this state has been that livestock owners may allow their animals to run at large."); *Gibbs v. Jackson*, 990 S.W.2d 745, 747 (Tex. 1999). Texas does, however, impose two statutory duties to restrain livestock. *Pruski*, 594 S.W.3d at 323; *Gibbs*, 990 S.W.2d at 748; *see also Billelo v. SLC McKinney Partners, L.P.*, 336 S.W.3d 852, 854 (Tex. App.—Dallas 2011, no pet.) (stating duty to confine animals within fences is "purely statutory in nature").

Section 143.102 of the Texas Agriculture Code, entitled "Running at Large on Highway Prohibited," provides that a "person who owns or has responsibility for the control of" certain livestock, including cows, "may not knowingly permit the animal to traverse or roam at large, unattended, on the right-of-way of a highway." TEX. AGRIC. CODE § 143.102. And Section 143.074 provides that in counties that have enacted stock laws, "a person may not permit any animal of the class mentioned in the [stock law] proclamation to run at large in the county." *Id.* § 143.074. Although both sections impose criminal penalties for violations,[10] courts have relied on the statutes to address civil liability and the corresponding standard of care

---

[10] *See* TEX. AGRIC. CODE § 143.082 (stating person commits Class C misdemeanor when they "knowingly permit[] a head of cattle or a domestic turkey to run at large in a county or area that has adopted this subchapter"); *id.* § 143.108(a)–(b) (stating person commits Class C misdemeanor when they violate Section 143.102).

applicable to livestock owners whose animals stray onto state highways or areas covered by a local stock law. *Pruski*, 594 S.W.3d at 325–26.

In *Pruski v. Garcia*, 594 S.W.3d 322 (Tex. 2020), the Texas Supreme Court explained that "[w]hen cars collide with livestock on state highways in counties with stock laws, the differing standards of livestock-owner liability imposed by section 143.102 and section 143.074 cannot both apply." *Id.* at 324. Following the Legislature's direction on how to resolve the conflict, the Court held that when, as here, accidents involving livestock occur on a state highway, Section 143.102 provides "the exclusive standard" for livestock-owner liability. *Id.* The difference matters "a great deal [because] Section 143.102 is violated only when the livestock owner *knowingly* permits the animal to run at large, while a violation of [S]ection 143.074 does not require the livestock owner's 'knowing' mental state." *Id.* (emphasis in original).

In analyzing Section 143.102, the *Pruski* court noted that neither party had addressed whether the statute "'create[d] an appropriate standard of care for civil liability purposes'" and that both the parties and the appellate court had assumed a violation of the statute gave rise to a tort action. *Id.* at 326 (quoting *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997)). Because the issue was not before it, the Court assumed, without deciding, that Section 143.102 creates an "appropriate standard of care for civil liability purposes" and that "civil liability may therefore be imposed"

17

for its violation. *Id.*; *see also Gibbs*, 990 S.W.2d at 749 (noting that "Texas courts have relied upon these two statutes, or their predecessors, to hold or assume that livestock owners may be liable for negligence if their animals stray onto highways").

As in *Pruski*, neither party here disputes that Section 143.102 creates a standard of care for civil liability purposes for livestock owners whose animals stray onto state highways. Both parties and the trial court assumed the application of the statute to impose civil liability on Arraby. For purposes of this appeal, we similarly assume, without deciding, that Section 143.102 establishes the applicable standard of care. *See Pruski*, 594 S.W.3d at 326 (observing that *Gibbs* did not "accept or reject" Section 143.102 "as a source of civil liability or make any holding about the contours of the civil-liability rules that arise from [this] statute[]" and assuming "as the parties do" that Section 143.102 creates standard of care for civil liability purposes).

## Discussion

In five issues, Arraby argues (1) there is insufficient evidence or no evidence to support the legal conclusion Arraby owed Brown a duty because Arraby did not own or control the cow, (2) there is insufficient evidence or no evidence Arraby breached a duty to Brown by knowingly permitting the cow to roam at large on a state highway, (3) the trial court abused its discretion in admitting and relying on the testimony of "Brown's unqualified experts" Bob Kingsbery and Floyd Luckett,

(4) there is insufficient evidence or no evidence it was foreseeable "the cow would escape," and (5) the "trial court's granular, excessive findings prevented Arraby from properly presenting its appeal."

Because the first and second issues are dispositive, we do not reach the remaining issues.

## A.    Analysis

The threshold inquiry in a negligence case is duty. *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). A plaintiff must establish the existence of "'a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach.'" *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (quoting *D. Hous., Inc. v. Love*, 92 S.W.3d 450, 453 (Tex. 2002)). The existence of duty is a question of law. *See Nabors*, 288 S.W.3d at 404. "The non-existence of a duty ends the inquiry." *Kennamer v. Estate of Noblitt*, 332 S.W.3d 559, 564 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

In rendering judgment for Brown, the trial court concluded that the "applicable law is found in Texas Agriculture Code § 143.102." It held that Arraby was liable to Brown under Section 143.102 because "Arraby had responsibility for the control of the cow" and "knowingly permitted the cow to roam at large, unattended, on the right-of-way of Highway 225." Arraby asserts there is

19

insufficient evidence or no evidence that Arraby had responsibility for control of the cow or that it knowingly allowed the cow to roam at large.

A person violates Section 143.102 if he (1) owns the animal or has responsibility for control of the animal, and (2) knowingly permits the animal to run at large on the right-of-way of a highway.[11] TEX. AGRIC. CODE § 143.102; *see also Pruski*, 594 S.W.3d at 324 ("Section 143.102 requires a 'knowing' mental state as a prerequisite to livestock-owner liability for highway accidents."). We analyze each element in turn.

## B.   Section 143.102:  Ownership or Control

The trial court did not conclude that Arraby owned the cow involved in the collision. Rather, in rendering judgment for Brown, the trial court concluded that Arraby had responsibility for control of the cow. Arraby argues there is insufficient evidence or no evidence it was responsible for control of the cow because Arraby relinquished control of the Property to Eugene and Mary Alice.[12] Citing *Levesque v. Wilkens*, 57 S.W.3d 499 (Tex. App.—Houston [14th Dist.] 2001, no pet.), Arraby argues that, as landlord, it owed no duty to Brown under Section 143.102 because

---

[11]   Section 143.101 defines "highway" as a "U.S. highway or a state highway in this state, but does not include a numbered farm-to-market road." TEX. AGRIC. CODE § 143.101.

[12]   Arraby also argues there is insufficient evidence that the cow involved in the accident was the Ybarras' pet cow. For purposes of this opinion, we assume, without deciding, that the cow Brown collided with was the cow being pastured on the Property.

20

that statute "places the risk upon the owner of the livestock, not the *owner* of the land." *Id.* at 505 (emphasis in original).

In *Levesque*, landowners executed a lease agreement transferring their exclusive possession of their property to the tenant. The tenant owned a bull that escaped from the property and caused an automobile accident. *Id.* at 502. Levesque, who was injured in the accident, sued the landowners of the property, among others. The landowners moved for summary judgment arguing they did not owe a duty to Levesque to prevent the bull from escaping their property because they had relinquished their rights to the property to the tenant who owned the bull. *See id.* ("The threshold inquiry is whether Landowners, as lessor, owed a legal duty to Levesque to prevent the danger that caused their injuries."). The trial court granted summary judgment in favor of the landowners and Levesque appealed. The court of appeals concluded that, "[b]ecause the lease agreement g[ave] [the tenant] the exclusive right to occupy the land from which the bull escaped, it follows that [the tenant] had exclusive possession and control of the land, the fence, and the bull." *Id.* at 505. The court further stated that "because section 143.102 [of the Texas Agriculture Code] places the risk upon the *owner* of the livestock, not the owner of the land, the statutory duty to prevent his livestock from wandering onto the highway [fell on the tenant], as owner and possessor of the animal. Therefore, under the

21

statute and the lease agreement, Landowners have no responsibility for control of the bull." *Id.* (emphasis in original).

Brown argues that Arraby's reliance on *Levesque* is misplaced because unlike in *Levesque*, there is no evidence here that Arraby relinquished control of the Property to Eugene and Mary Alice through a lease agreement or that a formal landlord-tenant relationship existed between Arraby and Eugene and Mary Alice. Brown further argues that Eugene and Mary Alice are not tenants because "[t]here was no evidence of any lease, any other agreement, rental payments, or anything else that would suggest a landlord-tenant relationship between Arraby and Eugene and Mary Alice."

We do not find *Levesque* instructive. In *Levesque*, it was not necessary for the court to conduct a factual inquiry to determine who had responsibility for control of the bull, because it was undisputed the tenant owned the bull and the written lease—the legal document before the court and to which no party objected— answered the question of possession over the land. Under the terms of the lease, the tenant had exclusive possession of the land and thus, the court concluded, over the fence and the bull it owned. *Id.* While we agree that a formal lease agreement can be used as evidence to determine whether a landowner has exclusive possession of property and control of any livestock pastured on the property, nothing in *Levesque* suggests that a lease agreement is the only evidence relevant to the inquiry or that in

22

the absence of a formal lease agreement, a landowner is responsible for control of livestock on its land.

We have not found, and the parties have not directed us to, any authority requiring the existence of a formal landlord-tenant relationship or a formal lease agreement to determine responsibility for control of livestock under Section 143.102. *See generally* TEX. AGRIC. CODE § 143.102 (prohibiting "person who owns or has responsibility for the control of" certain livestock, including cow, from "knowingly permit[ting] the animal to traverse or roam at large, unattended, on the right-of-way of a highway"); *see also Harlow v. Hayes*, No. 07-95-0210-CV, 1996 WL 467464, at *3 (Tex. App.—Amarillo Aug. 16, 1996, no writ) (not designated for publication) (explaining in case where lease existed, that landlord can be held liable when circumstances indicate retention of control over premises). Thus, whether Eugene and Mary Alice were Arraby's "tenants" under the present circumstances is not dispositive.

It is undisputed that Arraby owned the Property when the accident occurred. But Section 143.102 does not place the risk upon the *owner* of the land on which livestock is pastured. A landowner is liable under Section 143.102 only if it owns the animal or has responsibility for control of the animal. TEX. AGRIC. CODE § 143.102.

While the trial court found Victor's testimony "for the most part, was not credible," a trial court is not at liberty to "ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820. Victor consistently testified that Eugene and Mary Alice were responsible for the maintenance of and repairs to the Property before and after they conveyed the Property to Arraby in 2016. He testified that the only thing that changed after 2016 was who held title to the Property. According to Victor, his parents, who had owned the Property since 1973, "only signed [the Property] over to [Arraby in 2016] in case something happened to [Eugene]." Victor testified, "That was it. But nothing changed."[13] Victor testified that "it was [Eugene's and Mary Alice's] house, their property. . . . The only thing they did was sign it over to us. That was it." Victor's undisputed testimony was that by informal agreement with Arraby, Eugene and Mary Alice retained all the rights and obligations associated with the Property they had before conveying the Property to Arraby, including the right to exclusive possession and control of the Property.

Victor also testified that Arraby was not responsible for livestock on the Property, and that before and after the conveyance of the Property, Eugene was

---

[13] Victor also testified that Eugene and Mary Alice were responsible for paying the Property's taxes after they conveyed the Property to Arraby.

responsible for the cow. There is no evidence contradicting Victor's testimony that Eugene and Mary Alice retained the rights to the Property they had before the conveyance (other than legal title), and that they were responsible for control of the cow when the accident occurred in 2017.

There is also no evidence that Arraby had a right to enter the Property. *See Levesque*, 57 S.W.3d at 505 (holding landowner who relinquished exclusive right to occupy property through lease agreement and did not retain right of reentry did not have control of livestock that had escaped from property). While Victor testified that he and his siblings would visit their parents on the Property and fix anything that was "wrong at the house," there is no evidence Victor did so on behalf of Arraby, as opposed to his individual capacity as a family member.

There is also no evidence that Eugene did not maintain the Property's fences or care for the cow pastured on the Property. Victor testified that Eugene had workers for his restaurant and ranches, and he "would send" those workers to fix the Property's fences, take care of the cow, and address other maintenance concerns on the Property. Victor explained that Ray Gonzalez and Ray's mother were also present to "watch[] over the Property" and to help Mary Alice "with the house chores and everything." There is no evidence contradicting Victor's testimony.

Alice, Victor's sister, testified that Eugene and Mary Alice were not physically capable of inspecting or mending the fences on the Property or caring for

25

a cow. But Alice did not testify that Arraby was responsible for control of the cow. Indeed, no one did. Kingsbery and the trial court appeared to reach the conclusion that Arraby was responsible for control of the cow because Eugene and Mary Alice were not physically capable of doing so. Even if that were true, nothing in Alice's testimony or any other anyone else's testimony indicated that Eugene was not capable of directing his employees to maintain the fences on the Property or care for the cow pastured on the Property.

Mary Alice's interrogatory responses merely demonstrate that she and Eugene were not physically able to maintain or secure the Property's fences or "physically care for any livestock." Nothing in her responses indicates that Eugene was not capable of directing his employees to maintain the fences on the Property or care for any livestock pastured on the Property, or that Eugene and Mary Alice had not agreed to continue to be responsible for care of the Property or any livestock pastured on the Property after they conveyed the Property to Arraby in 2016. Indeed, Ray Gonzalez, who watched over the Property for the Ybarras, reported the cow missing two days before Brown's accident.

Victor's undisputed testimony that Arraby informally relinquished its right to exclusive possession of the Property to Eugene and Mary Alice and that Eugene continued to take care of the cow and the Property, via his workers, after transferring the Property to Arraby was "clear, positive, direct, otherwise credible, free from

26

contradictions and inconsistencies, and could have been readily controverted," and as such the trial court was not at liberty to disregard the testimony.[14] *See City of Keller*, 168 S.W.3d at 820. This evidence conclusively establishes that Eugene and Mary Alice had responsibility for control of the cow and the Property, not Arraby. *See id.* at 816 ("Evidence is conclusive only if reasonable people could not differ in their conclusions.").

Because the evidence conclusively establishes the opposite of a vital fact, in this case Arraby's responsibility for control of the cow, we conclude there is legally insufficient evidence supporting the trial court's finding that Arraby was responsible for control of the cow Brown struck with his car. *See id.* at 810 (stating there is legally insufficient evidence if evidence conclusively proves opposite of vital fact). We hold the trial court erred by concluding that Arraby owed a duty to Brown under Section 143.102 of the Texas Agriculture Code. *See Pruski*, 594 S.W.3d at 326; *Gibbs*, 990 S.W.2d at 749.

We sustain Arraby's first issue.

---

[14] For example, the existence of this informal agreement could have been controverted by Mary Alice in her discovery responses, by Ray Gonzalez who worked on the Property and reported the cow missing, by Alice, or by another of Eugene's and Mary Alice's children.

## C.  Section 143.102:  Knowingly Permitting the Cow to Roam at Large

Even if the evidence established Arraby had responsibility for control of the cow, there is legally insufficient evidence to support the trial court's finding that Arraby knowingly permitted the cow to roam at large on a state highway.  For there to be liability under Section 143.102, civil or criminal, it must be shown the defendant "knowingly permitted" the animal to roam at large on the highway.  *See Pruski*, 594 S.W.3d at 326.  Although the statute does not define the term "knowingly," under the Texas Penal Code

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE § 6.03(b); *see also Pruski*, 594 S.W.3d at 326–27.  Section 143.102 is thus violated only "if the livestock owner [or a person who has responsibility for control of the livestock] permits the animal to traverse or roam at large, unattended, on the right-of-way of a highway and does so with the knowing mental state traditionally applied in criminal law."[15]  *Id.* at 327.  The term "permit"

---

[15] The original predecessor to Section 143.102 prohibited livestock owners from permitting their animals to traverse or roam unattended on the right-of-way of a highway with fences on both sides.  *Pruski v. Garcia*, 594 S.W.3d 322, 328–29 (Tex. 2020).  In 1959, the prohibition was limited to "knowingly" permitting animals to roam at large on highways, but the scope of the statute was extended to cover highways whether "the adjacent land was fenced or not."  *Id.*  This was a "trade-off," providing "ranchers the protection of the 'knowingly' standard," but

usually "connotes awareness or assent, as opposed to mere oversight or negligence." *Id.*

Brown argues on appeal that Arraby is liable under Section 143.102 because it "admitted [the] the cow []kept in Arraby's pasture had gotten out," Arraby did not have "a planned response if the cow escaped from its [P]roperty," and Arraby "never talked to the La Porte police department about the cow that [] escaped." According to Brown, Kingsbery reviewed the evidence and "connected the dots."[16] He testified that the "fence [on the Property] needs to be checked, inspected, and maintained on a regular basis" and the cow "needs to be fed[,] watered, and the gates need to be checked to ensure they are not left open." Based on Kingsbery's understanding "that Eugene and Mary Alice were not physically capable of satisfying these

---

also expanding "their liability to include unfenced highways." *Id.* at 329. Notably, the 1959 amendment also added what is now Section 143.103, "which addresses the opposite situation: when liability will attach for *drivers* who 'strike[], kill[], or damage[] an unattended animal running at large on a highway.'" *Id.* (quoting Tex. Agric. Code § 143.103) (emphasis in original). Section 143.103 provides that such drivers are not liable "except on a finding of: (1) gross negligence in the operation of the vehicle; or (2) wilful [sic] intent to strike, kill, injure, or damage the animal." Tex. Agric. Code § 143.103. This "driver-liability" provision was part of another "legislative trade-off." *Pruski*, 594 S.W.3d at 329. "The Legislature decided that in collisions between livestock and cars on U.S. and state highways, neither side should be liable absent a heightened culpable mental state." *Id.*

[16] In its third issue, Arraby argues the trial court abused its discretion in admitting and relying on the testimony of "Brown's unqualified experts" Bob Kingsbery and Floyd Luckett. In light of our disposition, we need not reach this issue.

29

requirements" Kingsbery testified "it was his opinion that Victor and Troy knew the cow could get out of the pasture."

Even if true, this evidence does not establish liability under the applicable statute. Section 143.102 does not impose a duty to prevent all escapes of fenced animals. Rather, as the statute expressly provides, the duty is to not "knowingly permit the animal to traverse or roam at large, unattended, on the right-of-way of a highway." TEX. AGRIC. CODE § 143.102; *see also Pruski*, 594 S.W.3d at 327. The mere fact an animal escapes and makes its way onto a highway does not support a finding of culpability. *Beck v. Sheppard*, 566 S.W.2d 569, 572–73 (Tex. 1978) (holding that neither ownership of horse nor ownership of land on which horse was kept created presumption that horse's presence on highway was due to negligence of land or horse owner, and further holding that neither property nor horse owner were liable because there was no evidence any fences were down or gates open, or that horse had ever gotten out of pastures or had propensity for doing so). Similarly, mere knowledge that a cow may escape from pastured land is insufficient to establish the "knowingly" element under the statute. *Garcia v. Pruski*, 563 S.W.3d 333, 344 (Tex. App.—San Antonio 2018), reversed in part on other grounds, *Pruski v. Garcia*, 594 S.W.3d 322 (Tex. 2020) (holding that person "'who should have known'—but does not actually know—his bull was permitted to traverse or roam at large" on

30

highway "lacks the requisite awareness or understanding required by section 143.102").

Brown argues the trial court's finding that Arraby knowingly permitted the cow to roam at large on the highway is supported by the evidence because "inaction can support that finding." In support, Brown cites to *Dearbonne v. Courville*, No. 09-16-00440-CV, 2018 WL 4354310 (Tex. App.—Beaumont Sept. 13, 2018, no pet.) (mem. op.), *Rodriguez v. Sandhill Cattle Co., L.P.*, 427 S.W.3d 507 (Tex. App.—Amarillo 2014, no pet.), and *Rose v. Ben C. Hebert Heis*, 305 S.W.3d 874 (Tex. App.—Beaumont 2010, no pet.). But none of those cases support the "knowingly" element required in this case. Indeed, none of the cases involve Section 143.102—the applicable statute here.

In *Dearborne*, the plaintiffs were traveling in a car at night when they collided with horses on the roadway. They sued the alleged owner of the horses claiming he had been negligent in "allowing his horses to run free on the public roads." 2018 WL 4354310, at *1. *Dearbonne* involved livestock liability under Section 143.024, which, unlike Section 143.102, does not require a showing the defendant "knowingly" permitted the livestock to roam at large to establish liability. *See id.* at *8 (discussing liability under Section 143.024); *see also Pruski*, 594 S.W.3d at 327–28 (explaining that Section 143.102 requires finding of knowing conduct while

Section 143.074 does not).[17]  And even in that case, the court held that "an animal's escape is not alone evidence of misconduct on the part of its owner," holding that to establish "a breach under section 143.024" plaintiffs had to establish landowner had consented, expressly or formally, "to his horse(s) running at large" or given leave to "his horse(s) running at large."  *Dearbonne*, 2018 WL 4354310, at *8.  The court concluded there was no evidence to establish liability because, among other things, there was no evidence that the property's fences or gates were in disrepair or unsuitable or that horses had escaped from the property's enclosures in the past.  *Id.* at *10 (holding there was no evidence defendant "permitted" horse to escape as prohibited by statute).

Rose and Rodriguez also involved the violation of Section 143.074, a stock law involving a different standard than the standard required under Section 143.102.  *See Rodriguez*, 427 S.W.3d at 509–10 (discussing liability under Section 143.074); *Rose*, 305 S.W.3d at 879–81 (same); *see also Pruski*, 594 S.W.3d at 324 (explaining that "Section 143.102 is violated only when the livestock owner *knowingly* permits the animal to run at large, while a violation of [S]ection 143.074 does not require the livestock owner's 'knowing' mental state" and noting difference matters "a great

---

[17]    Sections 143.024 and 143.074 are substantially the same and apply in counties where stock laws have been adopted.  The only difference between the two statutes is the type of livestock involved.  *See* TEX. AGRIC. CODE § 143.024 (applying to horses, mules, jacks, jennets, donkeys, hogs, sheep, or goats); *id.* § 143.074 (applying to cattle and domestic turkeys).

deal") (emphasis in original).   In both cases, the courts clarified that even under that statute, more is required for liability than the mere possibility livestock may escape from its enclosure.  *Rose*, 305 S.W.3d at 881 ("[W]e are skeptical that the Legislature intended the duty it created in section 143.074 to extend to any person 'who makes possible' the escape of cattle from a pasture."); *see also Rodriguez*, 427 S.W.3d at 510 (adopting analysis in *Rose*).  And in both cases, the courts rejected liability under Section 143.074.

In *Rose*, the driver who collided with a bull on the road sued the landowner claiming the landowner was negligent in permitting the bull to roam at large.  *Rose*, 305 S.W.3d at 875.  The court ultimately concluded the landowner was not liable because, among other things, there was no evidence that the landowner had visited the property or entered the property's gate at any time relevant to the date of the accident, that the landowner left the gate open, that the landowner authorized the bull's owner to leave the gate open, that any cattle had previously escaped from the property or that the fence and its gate were not fit for the ordinary uses for which they were intended.  *Id.* at 881 ("In summary, there is no summary judgment evidence to raise any inference that the Landowners 'permitted' the bull's escape" as prohibited under Section 143.074).  The same result ensued in *Rodriguez*, where a driver who collided with cattle on a roadway sued the landowner for negligence under Section 143.074.  *Rodriguez*, 427 S.W.3d at 508.  The court held the

landowner was not liable because there was no evidence that the hot-wire fence used to enclose the cattle was unsuitable, that the cattle had previously escaped from its enclosure, that the landowner knew the hot-wire fence was inoperative, that the landowner failed to inspect the fence once the cattle were left, that the landowner allowed anyone to leave an opening in the hot-wire fence or that the landowner knew the cattle had escaped and did nothing. *Id.* at 511.

We similarly hold the evidence in this case is legally insufficient to support liability under Section 143.102. Kingsbery and the trial court focused significantly on the health and abilities of Eugene and Mary Alice in reaching their conclusion that Arraby breached Section 143.012.[18] But whether the elderly couple could physically care for the cow or the fence on the Property is irrelevant to establish Arraby's breach under Section 143.102. The question is not what Mary Alice and Eugene were capable of doing, but rather what Arraby did or failed to do in knowingly permitting the cow to roam on the highway.

Arraby presented testimony at trial that Eugene had workers to care for his properties and that they took care of the fence on the Property if any issues arose. Even if the trial court found this evidence not credible, there is no evidence the fence

---

[18] When asked how Arraby "knowingly permitted livestock to remain at large on the right-of-way of 225," Kingsbery testified: "By expecting their parents to inspect, maintain, and repair the fence." Kingsbery similar testified that "Arraby was responsible for the cow, and Arraby knowingly permitted the cow to wander by leaving it with two infirm and elderly people."

34

was not maintained or that there was anything wrong with the fence at the time of the accident.[19]  Kingsbery never inspected the Property or the fence, and neither did the investigating officers.  Kingsbery was thus unable to testify about the condition of the fence at the time of the accident or even after:

Q.      You don't know the condition of the fence right now or as it was back in March of 2017, do you?

A.      No.

. . .

Q. . . . What evidence do you have as we sit here today, that the fence, or any part of the fence . . . was deficient in any way?

A.      I have no evidence of that.

. . .

Q. . . . [Y]ou have no personal knowledge or evidence that this fence had any deficiencies or was not maintained, is that correct?

A.      That's correct.  I mean, I – my opinions are based on the fact the people who were living there were not physically capable of doing a good job of maintaining the fence.

---

[19]    In its findings of fact, the trial court found that Arraby had no records of maintenance on the Property.  But as Brown concedes, the absence of records is not evidence that the fence was not maintained or in proper condition when the accident occurred.

Q. But – but you have no evidence as we sit here today that the fence was not maintained properly, do you?

A. No personal knowledge, that's correct.

Kingsbery was similarly unable to give any opinion as to how the cow got out:

Q. How do you think the cow got out assuming . . . it was on the property, on the Ybarra property?

A. I don't know how the cow got out.

There is thus no evidence that the Property's fences and front gate were in disrepair or unsuitable, that the fence and its gate were not fit for the ordinary uses for which they were intended, that the fence had not been properly maintained, or that any cattle had previously escaped from the Property. And while there was testimony that Eugene and Mary Alice often left the front gate of the Property open, there was also testimony that the cow on the Property was pastured on the back of the Property which is enclosed by a separate fence. And as Kingsbery testified, he was unaware "of any evidence that the cow got out through a gate."

Because there is no more than a scintilla of evidence supporting Arraby's alleged knowing conduct, we conclude there is legally insufficient evidence supporting the trial court's finding that Arraby knowingly permitted the cow to roam at large on a state highway. *See City of Keller*, 168 S.W.3d at 810 (stating evidence

is legally insufficient when "the evidence offered to prove a vital fact is no more than a mere scintilla").

We sustain Arraby's second issue.

## Conclusion

We reverse the trial court's judgment and render judgment that Brown take nothing on his claims against Arraby Properties, LLC.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Farris.

Goodman, J., dissenting.